# COX BROADCASTING CORP. ET AL. *v.* COHN

No. 73–938.   Argued November 11, 1974—Decided March 3, 1975

470

*Kirk M. McAlpin* argued the cause for appellants. With him on the briefs was *Joseph R. Bankoff*.

*Stephen A. Land* argued the cause and filed briefs for appellee.*

MR. JUSTICE WHITE delivered the opinion of the Court.

The issue before us in this case is whether, consistently with the First and Fourteenth Amendments, a State may extend a cause of action for damages for invasion of privacy caused by the publication of the name of a deceased rape victim which was publicly revealed in connection with the prosecution of the crime.

I

In August 1971, appellee's 17-year-old daughter was the victim of a rape and did not survive the incident. Six youths were soon indicted for murder and rape. Although there was substantial press coverage of the crime and of subsequent developments, the identity of the victim was not disclosed pending trial, perhaps because of Ga. Code Ann. § 26-9901 (1972),[1] which makes

---

*Briefs of *amici curiae* were filed by *Arthur K. Bolton*, Attorney General, *Robert S. Stubbs II*, Executive Assistant Attorney General, and *Don A. Langham* and *Alfred L. Evans, Jr.*, Assistant Attorneys General, for the State of Georgia, and by *David L. Freeman* and *Alfred F. Burgess* for Multimedia, Inc.

[1] "It shall be unlawful for any news media or any other person to print and publish, broadcast, televise, or disseminate through any other medium of public dissemination or cause to be printed and published, broadcast, televised, or disseminated in any newspaper, magazine, periodical or other publication published in this State or through any radio or television broadcast originating in the State the name or identity of any female who may have been raped or upon whom an assault with intent to commit rape may have been made. Any person or corporation violating the provisions of this section shall, upon conviction, be punished as for a misdemeanor."

Three other States have similar statutes. See Fla. Stat. Ann. §§ 794.03, 794.04 (1965 and Supp. 1974–1975); S. C. Code Ann.

it a misdemeanor to publish or broadcast the name or identity of a rape victim. In April 1972, some eight months later, the six defendants appeared in court. Five pleaded guilty to rape or attempted rape, the charge of murder having been dropped. The guilty pleas were accepted by the court, and the trial of the defendant pleading not guilty was set for a later date.

In the course of the proceedings that day, appellant Wassell,[2] a reporter covering the incident for his employer, learned the name of the victim from an examination of the indictments which were made available for his inspection in the courtroom.[3] That the name of the

§ 16–81 (1962); Wis. Stat. Ann. § 942.02 (1958). The Wisconsin Supreme Court upheld the constitutionality of a predecessor of § 942.02 in *State* v. *Evjue*, 253 Wis. 146, 33 N. W. 2d 305 (1948). The South Carolina statute was involved in *Nappier* v. *Jefferson Standard Life Insurance Co.*, 322 F. 2d 502, 505 (CA4 1963), but no constitutional challenge to the statute was made. In *Hunter* v. *Washington Post*, 102 Daily Washington L. Rptr. 1561 (1974), the District of Columbia Superior Court denied the defendant's motion for judgment on the pleadings based upon constitutional grounds in an action brought for invasion of privacy resulting from the defendant's publication identifying the plaintiff as a rape victim and giving her name, age, and address.

[2] Wassell was employed at the time in question as a news staff reporter for WSB–TV and had been so employed for the prior nine years. His function was to investigate newsworthy stories and make televised news reports. He was assigned the coverage of the trial of the young men accused of the rape and murder of Cynthia Cohn on the morning of April 10, 1972, the day it began, and had not been involved with the story previously. He was present during the entire hearing that day except for the first 30 minutes. App. 16–17.

[3] Wassell has described the way in which he obtained the information reported in the broadcast as follows:

"The information on which I prepared the said report was obtained from several sources. First, by personally attending and taking notes of the said trial and the subsequent transfer of four of the six

victim appears in the indictments and that the indictments were public records available for inspection are not disputed.[4] Later that day, Wassell broadcast over the facilities of station WSB–TV, a television station owned by appellant Cox Broadcasting Corp., a news report con-

defendants to the Fulton County Jail, I obtained personal knowledge of the events that transpired during the trial of this action and the said transfer of the defendants. Such personal observations and notes were the primary and almost exclusive source of the information upon which the said news report was based. Secondly, during a recess of the said trial, I approached the clerk of the court, who was sitting directly in front of the bench, and requested to see a copy of the indictments. In open court, I was handed the indictments, both the murder and the rape indictments, and was allowed to examine fully this document. As is shown by the said indictments . . . the name of the said Cynthia Cohn appears in clear type. Moreover, no attempt was made by the clerk or anyone else to withhold the name and identity of the victim from me or from anyone else and the said indictments apparently were available for public inspection upon request." *Id.*, at 17–18.

[4] The indictments are in pertinent part as follows:

"THE GRAND JURORS selected, chosen and sworn for the County of Fulton . . . in the name and behalf of the citizens of Georgia, charge and accuse [the defendants] with the offense of:—

"RAPE

"for that said accused, in the County of Fulton and State of Georgia, on the 18th day of August, 1971 did have carnal knowledge of the person of Cynthia Leslie Cohn, a female, forcibly and against her will . . . ." *Id.*, at 22–23.

"THE GRAND JURORS selected, chosen and sworn for the County of Fulton . . . in the name and behalf of the citizens of Georgia, charge and accuse [the defendants] with the offense of:—

"MURDER

"for that said accused, in the County of Fulton and State of Georgia, on the 18th day of August, 1971 did while in the commission of the offense of Rape, a felony, upon the person of Cynthia Leslie Cohn, a female human being, cause her death by causing her to suffocate . . . ." *Id.*, at 24–25.

cerning the court proceedings. The report named the victim of the crime and was repeated the following day.[5]

In May 1972, appellee brought an action for money damages against appellants, relying on § 26–9901 and claiming that his right to privacy had been invaded by the television broadcasts giving the name of his deceased daughter. Appellants admitted the broadcasts but claimed that they were privileged under both state law and the First and Fourteenth Amendments. The trial court, rejecting appellants' constitutional claims and holding that the Georgia statute gave a civil remedy to those injured by its violation, granted summary judgment to appellee as to liability, with the determination of damages to await trial by jury.

On appeal, the Georgia Supreme Court, in its initial opinion, held that the trial court had erred in construing § 26–9901 to extend a civil cause of action for invasion of privacy and thus found it unnecessary to consider the constitutionality of the statute. 231 Ga. 60, 200 S. E. 2d 127 (1973). The court went on to rule, however, that the complaint stated a cause of action "for the invasion of the appellee's right of privacy, or for the tort of public disclosure"—a "common law tort exist[ing] in this jurisdiction without the help of the statute that the trial judge in this case relied on." *Id.*, at 62, 200 S. E. 2d, at 130. Although the privacy invaded was not that of the deceased victim, the father was held to have stated a

---

[5] The relevant portion of the transcript of the televised report reads as follows:

"Six youths went on trial today for the murder-rape of a teenaged girl.

"The six Sandy Springs High School boys were charged with murder and rape in the death of seventeen year old Cynthia Cohn following a drinking party last August 18th.

"The tragic death of the high school girl shocked the entire Sandy Springs community. Today the six boys had their day in court." App. 19–20.

claim for invasion of his own privacy by reason of the publication of his daughter's name. The court explained, however, that liability did not follow as a matter of law and that summary judgment was improper; whether the public disclosure of the name actually invaded appellee's "zone of privacy," and if so, to what extent, were issues to be determined by the trier of fact. Also, "in formulating such an issue for determination by the fact-finder, it is reasonable to require the appellee to prove that the appellants invaded his privacy with wilful or negligent disregard for the fact that reasonable men would find the invasion highly offensive." *Id.*, at 64, 200 S. E. 2d, at 131. The Georgia Supreme Court did agree with the trial court, however, that the First and Fourteenth Amendments did not, as a matter of law, require judgment for appellants. The court concurred with the statement in *Briscoe* v. *Reader's Digest Assn., Inc.,* 4 Cal. 3d 529, 541, 483 P. 2d 34, 42 (1971), that "the rights guaranteed by the First Amendment do not require total abrogation of the right to privacy. The goals sought by each may be achieved with a minimum of intrusion upon the other."

Upon motion for rehearing the Georgia court countered the argument that the victim's name was a matter of public interest and could be published with impunity by relying on § 26–9901 as an authoritative declaration of state policy that the name of a rape victim was not a matter of public concern. This time the court felt compelled to determine the constitutionality of the statute and sustained it as a "legitimate limitation on the right of freedom of expression contained in the First Amendment." The court could discern "no public interest or general concern about the identity of the victim of such a crime as will make the right to disclose the identity of the victim rise to the level of First Amendment protection." 231 Ga., at 68, 200 S. E. 2d, at 134.

We postponed decision as to our jurisdiction over this appeal to the hearing on the merits. 415 U. S. 912 (1974). We conclude that the Court has jurisdiction, and reverse the judgment of the Georgia Supreme Court.

## II

Appellants invoke the appellate jurisdiction of this Court under 28 U. S. C. § 1257 (2) and, if that jurisdictional basis is found to be absent, through a petition for certiorari under 28 U. S. C. § 2103. Two questions concerning our jurisdiction must be resolved: (1) whether the constitutional validity of § 26–9901 was "drawn in question," with the Georgia Supreme Court upholding its validity, and (2) whether the decision from which this appeal has been taken is a "[f]inal judgment or decree."

### A

Appellants clearly raised the issue of the constitutionality of § 26–9901 in their motion for rehearing in the Georgia Supreme Court. In denying that motion that court held: "A majority of this court does not consider this statute to be in conflict with the First Amendment." 231 Ga., at 68, 200 S. E. 2d, at 134. Since the court relied upon the statute as a declaration of the public policy of Georgia that the disclosure of a rape victim's name was not to be protected expression, the statute was drawn in question in a manner directly bearing upon the merits of the action, and the decision in favor of its constitutional validity invokes this Court's appellate jurisdiction. Cf. *Garrity* v. *New Jersey*, 385 U. S. 493, 495–496 (1967).

### B

Since 1789, Congress has granted this Court appellate jurisdiction with respect to state litigation only after the highest state court in which judgment could be had has

rendered a "[f]inal judgment or decree." Title 28 U. S. C. § 1257 retains this limitation on our power to review cases coming from state courts. The Court has noted that "[c]onsiderations of English usage as well as those of judicial policy" would justify an interpretation of the final-judgment rule to preclude review "where anything further remains to be determined by a State court, no matter how dissociated from the only federal issue that has finally been adjudicated by the highest court of the State." *Radio Station WOW, Inc.* v. *Johnson,* 326 U. S. 120, 124 (1945). But the Court there observed that the rule had not been administered in such a mechanical fashion and that there were circumstances in which there has been "a departure from this requirement of finality for federal appellate jurisdiction." *Ibid.*

These circumstances were said to be "very few," *ibid.;* but as the cases have unfolded, the Court has recurringly encountered situations in which the highest court of a State has finally determined the federal issue present in a particular case, but in which there are further proceedings in the lower state courts to come. There are now at least four categories of such cases in which the Court has treated the decision on the federal issue as a final judgment for the purposes of 28 U. S. C. § 1257 and has taken jurisdiction without awaiting the completion of the additional proceedings anticipated in the lower state courts. In most, if not all, of the cases in these categories, these additional proceedings would not require the decision of other federal questions that might also require review by the Court at a later date,[6] and imme-

---

[6] Eminent domain proceedings are of the type that may involve an interlocutory decision as to a federal question with another federal question to be decided later. "For in those cases the federal constitutional question embraces not only a taking, but a taking on payment of just compensation. A state judgment is not final unless it covers both aspects of that integral problem." *North Dakota*

diate rather than delayed review would be the best way to avoid "the mischief of economic waste and of delayed justice," *Radio Station WOW, Inc.* v. *Johnson, supra,* at 124, as well as precipitate interference with state litigation.[7] In the cases in the first two categories considered below, the federal issue would not be mooted or otherwise affected by the proceedings yet to be had because those proceedings have little substance, their outcome is certain, or they are wholly unrelated to the federal question. In the other two categories, however, the federal issue would be mooted if the petitioner or appellant seeking to bring the action here prevailed on the merits in the later state-court proceedings, but there is neverthe-

*State Board of Pharmacy* v. *Snyder's Drug Stores, Inc.,* 414 U. S. 156, 163 (1973). See also *Grays Harbor Co.* v. *Coats-Fordney Co.,* 243 U. S. 251, 256 (1917); *Radio Station WOW, Inc.* v. *Johnson,* 326 U. S. 120, 127 (1945).

[7] *Gillespie* v. *United States Steel Corp.,* 379 U. S. 148 (1964), arose in the federal courts and involved the requirement of 28 U. S. C. § 1291 that judgments of district courts be final if they are to be appealed to the courts of appeals. In the course of deciding that the judgment of the District Court in the case had been final, the Court indicated its approach to finality requirements:

"And our cases long have recognized that whether a ruling is 'final' within the meaning of § 1291 is frequently so close a question that decision of that issue either way can be supported with equally forceful arguments, and that it is impossible to devise a formula to resolve all marginal cases coming within what might well be called the 'twilight zone' of finality. Because of this difficulty this Court has held that the requirement of finality is to be given a 'practical rather than a technical construction.' *Cohen* v. *Beneficial Industrial Loan Corp.,* [337 U. S. 541, 546]. See also *Brown Shoe Co.* v. *United States,* 370 U. S. 294, 306; *Bronson* v. *Railroad Co.,* 2 Black 524, 531; *Forgay* v. *Conrad,* 6 How. 201, 203. *Dickinson* v. *Petroleum Conversion Corp.,* 338 U. S. 507, 511, pointed out that in deciding the question of finality the most important competing considerations are 'the inconvenience and costs of piecemeal review on the one hand and the danger of denying justice by delay on the other.'" 379 U. S., at 152–153.

less sufficient justification for immediate review of the federal question finally determined in the state courts.

In the first category are those cases in which there are further proceedings—even entire trials—yet to occur in the state courts but where for one reason or another the federal issue is conclusive or the outcome of further proceedings preordained. In these circumstances, because the case is for all practical purposes concluded, the judgment of the state court on the federal issue is deemed final. In *Mills* v. *Alabama*, 384 U. S. 214 (1966), for example, a demurrer to a criminal complaint was sustained on federal constitutional grounds by a state trial court. The State Supreme Court reversed, remanding for jury trial. This Court took jurisdiction on the reasoning that the appellant had no defense other than his federal claim and could not prevail at trial on the facts or any nonfederal ground. To dismiss the appeal "would not only be an inexcusable delay of the benefits Congress intended to grant by providing for appeal to this Court, but it would also result in a completely unnecessary waste of time and energy in judicial systems already troubled by delays due to congested dockets." *Id.*, at 217–218 (footnote omitted).[8]

---

[8] Other cases from state courts where this Court's jurisdiction was sustained for similar reasons include: *Organization for a Better Austin* v. *Keefe*, 402 U. S. 415, 418 n. (1971); *Construction Laborers* v. *Curry*, 371 U. S. 542, 550–551 (1963); *Pope* v. *Atlantic C. L. R. Co.*, 345 U. S. 379, 382 (1953); *Richfield Oil Corp.* v. *State Board*, 329 U. S. 69, 73–74 (1946). In the *Richfield* case the Court said with respect to finality:

"The designation given the judgment by state practice is not controlling. *Department of Banking* v. *Pink*, 317 U. S. 264, 268. The question is whether it can be said that 'there is nothing more to be decided' (*Clark* v. *Williard*, 292 U. S. 112, 118), that there has been 'an effective determination of the litigation.' *Market Street Ry. Co.* v. *Railroad Commission*, 324 U. S. 548, 551; see *Radio Station WOW* v. *Johnson*, 326 U. S. 120, 123–124. That question will be

Second, there are cases such as *Radio Station WOW,*
*supra,* and *Brady* v. *Maryland,* 373 U. S. 83 (1963), in
which the federal issue, finally decided by the highest
court in the State, will survive and require decision re-
gardless of the outcome of future state-court proceedings.
In *Radio Station WOW,* the Nebraska Supreme Court
directed the transfer of the properties of a federally li-
censed radio station and ordered an accounting, rejecting
the claim that the transfer order would interfere with the
federal license.   The federal issue was held reviewable
here despite the pending accounting on the "presupposi-
tion . . . that the federal questions that could come here
have been adjudicated by the State court, and that
the accounting which remains to be taken could not
remotely give rise to a federal question . . . that may
later come here . . . ."   326 U. S., at 127.   The judgment
rejecting the federal claim and directing the trans-
fer was deemed "dissociated from a provision for an
accounting even though that is decreed in the same
order."   *Id.,* at 126.   Nothing that could happen in the
course of the accounting, short of settlement of the case,
would foreclose or make unnecessary decision on the fed-
eral question.   Older cases in the Court had reached the
same result on similar facts.   *Carondelet Canal & Nav.*
*Co.* v. *Louisiana,* 233 U. S. 362 (1914) ; *Forgay* v. *Conrad,*
6 How. 201 (1848).   In the latter case, the Court, in an
opinion by Mr. Chief Justice Taney, stated that the Court
had not understood the final-judgment rule "in this
strict and technical sense, but has given [it] a more
liberal, and, as we think, a more reasonable construction,

---

resolved not only by an examination of the entire record (*Clark* v.
*Williard, supra*) but, where necessary, by resort to the local law to
determine what effect the judgment has under the state rules of
practice."   *Id.,* at 72.

and one more consonant to the intention of the legislature." *Id.*, at 203.[9]

In the third category are those situations where the federal claim has been finally decided, with further proceedings on the merits in the state courts to come, but in which later review of the federal issue cannot be had, whatever the ultimate outcome of the case. Thus, in these cases, if the party seeking interim review ultimately prevails on the merits, the federal issue will be mooted; if he were to lose on the merits, however, the governing state law would not permit him again to present his federal claims for review. The Court has taken jurisdiction in these circumstances prior to completion of the case in the state courts. *California* v. *Stewart*, 384 U. S. 436 (1966) (decided with *Miranda* v. *Arizona*), epitomizes this category. There the state court reversed a conviction on federal constitutional grounds and remanded for a new trial. Although the State might have prevailed at trial, we granted its petition for certiorari and affirmed, explaining that the state judgment was "final" since an acquittal of the defendant at trial would preclude, under state law, an appeal by the State. *Id.*, at 498 n. 71.

A recent decision in this category is *North Dakota State Board of Pharmacy* v. *Snyder's Drug Stores, Inc.*, 414 U. S. 156 (1973), in which the Pharmacy Board rejected an application for a pharmacy operating permit relying on a state statute specifying ownership requirements which the applicant did not meet. The State Supreme

---

[9] In *Brady* v. *Maryland*, 373 U. S. 83 (1963), the Maryland courts had ordered a new trial in a criminal case but on punishment only, and the petitioner asserted here that he was entitled to a new trial on guilt as well. We entertained the case, saying that the federal issue was separable and would not be mooted by the new trial on punishment ordered in the state courts. *Id.*, at 85 n. 1.

Court held the statute unconstitutional and remanded the matter to the Board for further consideration of the application, freed from the constraints of the ownership statute. The Board brought the case here, claiming that the statute was constitutionally acceptable under modern cases. After reviewing the various circumstances under which the finality requirement has been deemed satisfied despite the fact that litigation had not terminated in the state courts, we entertained the case over claims that we had no jurisdiction. The federal issue would not survive the remand, whatever the result of the state administrative proceedings. The Board might deny the license on state-law grounds, thus foreclosing the federal issue, and the Court also ascertained that under state law the Board could not bring the federal issue here in the event the applicant satisfied the requirements of state law except for the invalidated ownership statute. Under these circumstances, the issue was ripe for review.[10]

Lastly, there are those situations where the federal issue has been finally decided in the state courts with further proceedings pending in which the party seeking review here might prevail on the merits on nonfederal grounds, thus rendering unnecessary review of the federal issue by this Court, and where reversal of the state court on the federal issue would be preclusive of any further

---

[10] *Cohen* v. *Beneficial Industrial Loan Corp.*, 337 U. S. 541 (1949), was a diversity action in the federal courts in the course of which there arose the question of the validity of a state statute requiring plaintiffs in stockholder suits to post security for costs as a prerequisite to bringing the action. The District Court held the state law inapplicable, the Court of Appeals reversed, and this Court, after granting certiorari, held that the issue of security for costs was separable from and independent of the merits and that if review were to be postponed until the termination of the litigation, "it will be too late effectively to review the present order, and the rights conferred by the statute, if it is applicable, will have been lost, probably irreparably." *Id.*, at 546.

litigation on the relevant cause of action rather than merely controlling the nature and character of, or determining the admissibility of evidence in, the state proceedings still to come. In these circumstances, if a refusal immediately to review the state-court decision might seriously erode federal policy, the Court has entertained and decided the federal issue, which itself has been finally determined by the state courts for purposes of the state litigation.

In *Construction Laborers* v. *Curry*, 371 U. S. 542 (1963), the state courts temporarily enjoined labor union picketing over claims that the National Labor Relations Board had exclusive jurisdiction of the controversy. The Court took jurisdiction for two independent reasons. First, the power of the state court to proceed in the face of the preemption claim was deemed an issue separable from the merits and ripe for review in this Court, particularly "when postponing review would seriously erode the national labor policy requiring the subject matter of respondents' cause to be heard by the . . . Board, not by the state courts." *Id.*, at 550. Second, the Court was convinced that in any event the union had no defense to the entry of a permanent injunction other than the preemption claim that had already been ruled on in the state courts. Hence the case was for all practical purposes concluded in the state tribunals.

In *Mercantile National Bank* v. *Langdeau*, 371 U. S. 555 (1963), two national banks were sued, along with others, in the courts of Travis County, Tex. The claim asserted was conspiracy to defraud an insurance company. The banks as a preliminary matter asserted that a special federal venue statute immunized them from suit in Travis County and that they could properly be sued only in another county. Although trial was still to be had and the banks might well prevail on the merits, the Court, relying on *Curry*, entertained the issue as a "sep-

arate and independent matter, anterior to the merits and not enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.*, at 558. Moreover, it would serve the policy of the federal statute "to determine now in which state court appellants may be tried rather than to subject them . . . to long and complex litigation which may all be for naught if consideration of the preliminary question of venue is postponed until the conclusion of the proceedings." *Ibid.*

*Miami Herald Publishing Co.* v. *Tornillo,* 418 U. S. 241 (1974), is the latest case in this category.[11] There a candidate for public office sued a newspaper for refusing, allegedly contrary to a state statute, to carry his reply to the paper's editorial critical of his qualifications. The trial court held the act unconstitutional, denying both injunctive relief and damages. The State Supreme Court reversed, sustaining the statute against the challenge based upon the First and Fourteenth Amendments and remanding the case for a trial and appropriate relief, including damages. The newspaper brought the case here. We sustained our jurisdiction, relying on the principles elaborated in the *North Dakota* case and observing:

"Whichever way we were to decide on the merits, it

---

[11] Meanwhile *Hudson Distributors* v. *Eli Lilly,* 377 U. S. 386 (1964), another case of this genre, had been decided. There a retailer sued to invalidate a state fair trade act as inconsistent with the federal antitrust laws and not saved by a federal statute authorizing state fair trade legislation under certain conditions. The defendant manufacturer cross-petitioned for enforcement of the state act against the plaintiff-retailer. The trial court struck down the statute, but a state appellate court reversed and remanded for trial on the cross-petition. The Ohio Supreme Court affirmed that decision. Relying on *Curry* and *Mercantile National Bank* v. *Langdeau,* 371 U. S. 555 (1963), this Court found the state-court judgment to be ripe for review, although the retailer might prevail at the trial. 377 U. S., at 389 n. 4.

would be intolerable to leave unanswered, under these circumstances, an important question of freedom of the press under the First Amendment; an uneasy and unsettled constitutional posture of § 104.38 could only further harm the operation of a free press. *Mills* v. *Alabama,* 384 U. S. 214, 221–222 (1966) (DOUGLAS, J., concurring). See also *Organization for a Better Austin* v. *Keefe,* 402 U. S. 415, 418 n. (1971)." 418 U. S., at 247 n. 6.[12]

In light of the prior cases, we conclude that we have jurisdiction to review the judgment of the Georgia Supreme Court rejecting the challenge under the First and Fourteenth Amendments to the state law authorizing damage suits against the press for publishing the name of a rape victim whose identity is revealed in the course of a public prosecution. The Georgia Supreme Court's judgment is plainly final on the federal issue and is not subject to further review in the state courts. Appellants will be liable for damages if the elements of the state cause of action are proved. They may prevail at trial on nonfederal grounds, it is true, but if the Georgia court erroneously upheld the statute, there should be no trial at all. Moreover, even if appellants prevailed at trial and made unnecessary further consideration of the constitutional question, there would remain in effect the unreviewed decision of the State Supreme Court that a civil action for publishing the name of a rape victim disclosed in a public judicial proceeding may go forward despite the First and Fourteenth Amendments. Delaying final

---

[12] The import of the Court's holding in *Tornillo* is underlined by its citation of the concurring opinion in *Mills* v. *Alabama.* There, MR. JUSTICE DOUGLAS, joined by MR. JUSTICE BRENNAN, stated that even if the appellant had a defense and might prevail at trial, jurisdiction was properly noted in order to foreclose unwarranted restrictions on the press should the state court's constitutional judgment prove to be in error.

decision of the First Amendment claim until after trial will "leave unanswered . . . an important question of freedom of the press under the First Amendment," "an uneasy and unsettled constitutional posture [that] could only further harm the operation of a free press." *Tornillo, supra,* at 247 n. 6. On the other hand, if we now hold that the First and Fourteenth Amendments bar civil liability for broadcasting the victim's name, this litigation ends. Given these factors—that the litigation could be terminated by our decision on the merits [13] and that a failure to decide the question now will leave the press in Georgia operating in the shadow of the civil and criminal sanctions of a rule of law and a statute the constitutionality of which is in serious doubt—we find that reaching the merits is consistent with the pragmatic approach that we have followed in the past in determining finality.

---

[13] MR. JUSTICE REHNQUIST, *post,* at 507–508, is correct in saying that this factor involves consideration of the merits in determining jurisdiction. But it does so only to the extent of determining that the issue is substantial and only in the context that if the state court's final decision on the federal issue is incorrect, federal law forecloses further proceedings in the state court. That the petitioner who protests against the state court's decision on the federal question might prevail on the merits on nonfederal grounds in the course of further proceedings anticipated in the state court and hence obviate later review of the federal issue here is not preclusive of our jurisdiction. *Curry, Langdeau, North Dakota State Board of Pharmacy, California* v. *Stewart,* 384 U. S. 436 (1966) (decided with *Miranda* v. *Arizona*), and *Miami Herald Publishing Co.* v. *Tornillo,* 418 U. S. 241 (1974), make this clear. In those cases, the federal issue having been decided, arguably wrongly, and being determinative of the litigation if decided the other way, the finality rule was satisfied.

The author of the dissent, a member of the majority in *Tornillo,* does not disavow that decision. He seeks only to distinguish it by indicating that the First Amendment issue at stake there was more important and pressing than the one here. This seems to embrace the thesis of that case and of this one as far as the approach to finality is concerned, even though the merits and the avoidance doctrine are to some extent involved.

See *Gillespie* v. *United States Steel Corp.*, 379 U. S. 148 (1964); *Radio Station WOW, Inc.* v. *Johnson,* 326 U. S., at 124; *Mills* v. *Alabama,* 384 U. S., at 221–222 (DOUG-LAS, J., concurring).[14]

### III

Georgia stoutly defends both § 26–9901 and the State's common-law privacy action challenged here. Its claims are not without force, for powerful arguments can be made, and have been made, that however it may be ultimately defined, there *is* a zone of privacy surrounding every individual, a zone within which the State may protect him from intrusion by the press, with all its attendant publicity.[15] Indeed, the central thesis of the root article by Warren and Brandeis, The Right to Privacy, 4 Harv. L. Rev. 193, 196 (1890), was that the press was overstepping its prerogatives by publishing essentially private information and that there should be a remedy for the alleged abuses.[16]

---

[14] In finding that we have appellate jurisdiction, we also take jurisdiction over any aspects of the case which would otherwise fall solely within our certiorari jurisdiction. See *Flournoy* v. *Wiener,* 321 U. S. 253, 263 (1944); *Prudential Insurance Co.* v. *Cheek,* 259 U. S. 530, 547 (1922); cf. *Palmore* v. *United States,* 411 U. S. 389, 397 n. 6 (1973); *Mishkin* v. *New York,* 383 U. S. 502, 512 (1966).

[15] See T. Emerson, The System of Freedom of Expression 544–562 (1970); Konvitz, Privacy and the Law: A Philosophical Prelude, 31 Law & Contemp. Prob. 272 (1966); Bloustein, Privacy as an Aspect of Human Dignity: An Answer to Dean Prosser, 39 N. Y. U. L. Rev. 962 (1964).

[16] "Of the desirability—indeed of the necessity—of some such protection [of the right of privacy], there can, it is believed, be no doubt. The press is overstepping in every direction the obvious bounds of propriety and of decency. Gossip is no longer the resource of the idle and of the vicious, but has become a trade, which is pursued with industry as well as effrontery. To satisfy a prurient taste the details of sexual relations are spread broadcast in the columns of the daily papers. To occupy the indolent, column upon column is filled with idle gossip, which can only be procured by

More compellingly, the century has experienced a strong tide running in favor of the so-called right of privacy. In 1967, we noted that "[i]t has been said that a 'right of privacy' has been recognized at common law in 30 States plus the District of Columbia and by statute in four States." *Time, Inc.* v. *Hill,* 385 U. S. 374, 383 n. 7. We there cited the 1964 edition of Prosser's Law of Torts. The 1971 edition of that same source states that "[i]n one form or another, the right of privacy is by this time recognized and accepted in all but a very few jurisdictions." W. Prosser, Law of Torts 804 (4th ed.) (footnote omitted). Nor is it irrelevant

---

intrusion upon the domestic circle. The intensity and complexity of life, attendant upon advancing civilization, have rendered necessary some retreat from the world, and man, under the refining influence of culture, has become more sensitive to publicity, so that solitude and privacy have become more essential to the individual; but modern enterprise and invention have, through invasions upon his privacy, subjected him to mental pain and distress, far greater than could be inflicted by mere bodily injury. Nor is the harm wrought by such invasions confined to the suffering of those who may be made the subjects of journalistic or other enterprise. In this, as in other branches of commerce, the supply creates the demand. Each crop of unseemly gossip, thus harvested, becomes the seed of more, and, in direct proportion to its circulation, results in a lowering of social standards and of morality. Even gossip apparently harmless, when widely and persistently circulated, is potent for evil. It both belittles and perverts. It belittles by inverting the relative importance of things, thus dwarfing the thoughts and aspirations of a people. When personal gossip attains the dignity of print, and crowds the space available for matters of real interest to the community, what wonder that the ignorant and thoughtless mistake its relative importance. Easy of comprehension, appealing to that weak side of human nature which is never wholly cast down by the misfortunes and frailties of our neighbors, no one can be surprised that it usurps the place of interest in brains capable of other things. Triviality destroys at once robustness of thought and delicacy of feeling. No enthusiasm can flourish, no generous impulse can survive under its blighting influence."

here that the right of privacy is no recent arrival in the jurisprudence of Georgia, which has embraced the right in some form since 1905 when the Georgia Supreme Court decided the leading case of *Pavesich* v. *New England Life Ins. Co.*, 122 Ga. 190, 50 S. E. 68.

These are impressive credentials for a right of privacy,[17] but we should recognize that we do not have at issue here an action for the invasion of privacy involving the appropriation of one's name or photograph, a physical or other tangible intrusion into a private area, or a publication of otherwise private information that is also false although perhaps not defamatory. The version of the privacy tort now before us—termed in Georgia "the tort of public disclosure," 231 Ga., at 60, 200 S. E. 2d, at 130— is that in which the plaintiff claims the right to be free from unwanted publicity about his private affairs, which, although wholly true, would be offensive to a person of ordinary sensibilities. Because the gravamen of the claimed injury is the publication of information, whether true or not, the dissemination of which is embarrassing or otherwise painful to an individual, it is here that claims of privacy most directly confront the constitutional freedoms of speech and press. The face-off is apparent, and the appellants urge upon us the broad holding that the press may not be made criminally or civilly liable for publishing information that is neither false nor misleading but absolutely accurate, however damaging it may be to reputation or individual sensibilities.

It is true that in defamation actions, where the protected interest is personal reputation, the prevailing view is that truth is a defense;[18] and the message of *New York*

<hr>

[17] See also *Time, Inc.* v. *Hill*, 385 U. S. 374, 404 (1967) (opinion of Harlan, J.); *id.*, at 412–415 (Fortas, J., dissenting).

[18] See Restatement (Second) of Torts § 582 (Tent. Draft No. 20, Apr. 25, 1974); W. Prosser, Law of Torts § 116 (4th ed. 1971). Under the common law, truth was not a complete defense to prose-

*Times Co.* v. *Sullivan,* 376 U. S. 254 (1964); *Garrison* v.
*Louisiana,* 379 U. S. 64 ( 1964); *Curtis Publishing Co.* v.
*Butts,* 388 U. S. 130 (1967), and like cases is that the
defense of truth is constitutionally required where the
subject of the publication is a public official or public
figure. What is more, the defamed public official or
public figure must prove not only that the publication is
false but that it was knowingly so or was circulated with
reckless disregard for its truth or falsity. Similarly,
where the interest at issue is privacy rather than reputa-
tion and the right claimed is to be free from the publi-
cation of false or misleading information about one's
affairs, the target of the publication must prove knowing
or reckless falsehood where the materials published, al-
though assertedly private, are "matters of public inter-
est." *Time, Inc.* v. *Hill, supra,* at 387–388.[19]

The Court has nevertheless carefully left open the
question whether the First and Fourteenth Amendments
require that truth be recognized as a defense in a defama-
tion action brought by a private person as distinguished
from a public official or public figure. *Garrison* held that
where criticism is of a public official and his conduct of
public business, "the interest in private reputation is over-

cutions for criminal libel, although it was in civil actions. Several
jurisdictions in this country have provided, however, that the de-
fense of truth in civil actions requires a showing that the publication
was made for good motives or for justifiable ends. See *id.,* at
796–797.

[19] In another "false light" invasion of privacy case before us this
Term, *Cantrell* v. *Forest City Publishing Co.,* 419 U. S. 245, 250–251
(1974), we observed that we had, in that case, "no occasion to con-
sider whether a State may constitutionally apply a more relaxed
standard of liability for a publisher or broadcaster of false state-
ments injurious to a private individual under a false-light theory of
invasion of privacy, or whether the constitutional standard an-
nounced in *Time, Inc.* v. *Hill* applies to all false-light cases. Cf.
*Gertz* v. *Robert Welch, Inc.,* 418 U. S. 323."

borne by the larger public interest, secured by the Constitution, in the dissemination of truth," 379 U. S., at 73 (footnote omitted), but recognized that "different interests may be involved where purely private libels, totally unrelated to public affairs, are concerned; therefore, nothing we say today is to be taken as intimating any views as to the impact of the constitutional guarantees in the discrete area of purely private libels." *Id.*, at 72 n. 8. In similar fashion, *Time, Inc.* v. *Hill, supra,* expressly saved the question whether truthful publication of very private matters unrelated to public affairs could be constitutionally proscribed. 385 U. S., at 383 n. 7.

Those precedents, as well as other considerations, counsel similar caution here. In this sphere of collision between claims of privacy and those of the free press, the interests on both sides are plainly rooted in the traditions and significant concerns of our society. Rather than address the broader question whether truthful publications may ever be subjected to civil or criminal liability consistently with the First and Fourteenth Amendments, or to put it another way, whether the State may ever define and protect an area of privacy free from unwanted publicity in the press, it is appropriate to focus on the narrower interface between press and privacy that this case presents, namely, whether the State may impose sanctions on the accurate publication of the name of a rape victim obtained from public records—more specifically, from judicial records which are maintained in connection with a public prosecution and which themselves are open to public inspection. We are convinced that the State may not do so.

In the first place, in a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations. Great responsibility

is accordingly placed upon the news media to report fully and accurately the proceedings of government, and official records and documents open to the public are the basic data of governmental operations. Without the information provided by the press most of us and many of our representatives would be unable to vote intelligently or to register opinions on the administration of government generally. With respect to judicial proceedings in particular, the function of the press serves to guarantee the fairness of trials and to bring to bear the beneficial effects of public scrutiny upon the administration of justice. See *Sheppard* v. *Maxwell*, 384 U. S. 333, 350 (1966).

Appellee has claimed in this litigation that the efforts of the press have infringed his right to privacy by broadcasting to the world the fact that his daughter was a rape victim. The commission of crime, prosecutions resulting from it, and judicial proceedings arising from the prosecutions, however, are without question events of legitimate concern to the public and consequently fall within the responsibility of the press to report the operations of government.

The special protected nature of accurate reports of judicial proceedings has repeatedly been recognized. This Court, in an opinion written by MR. JUSTICE DOUGLAS, has said:

> "A trial is a public event. What transpires in the court room is public property. If a transcript of the court proceedings had been published, we suppose none would claim that the judge could punish the publisher for contempt. And we can see no difference though the conduct of the attorneys, of the jury, or even of the judge himself, may have reflected on the court. *Those who see and hear what transpired can report it with impunity.* There is no special perquisite of the judiciary which enables

it, as distinguished from other institutions of democratic government, to suppress, edit, or censor events which transpire in proceedings before it." *Craig* v. *Harney,* 331 U. S. 367, 374 (1947) (emphasis added).

See also *Sheppard* v. *Maxwell, supra,* at 362–363; *Estes* v. *Texas,* 381 U. S. 532, 541–542 (1965); *Pennekamp* v. *Florida,* 328 U. S. 331 (1946); *Bridges* v. *California,* 314 U. S. 252 (1941).

The developing law surrounding the tort of invasion of privacy recognizes a privilege in the press to report the events of judicial proceedings. The Warren and Brandeis article, *supra,* noted that the proposed new right would be limited in the same manner as actions for libel and slander where such a publication was a privileged communication: "the right to privacy is not invaded by any publication made in a court of justice . . . and (at least in many jurisdictions) reports of any such proceedings would in some measure be accorded a like privilege." [20]

The Restatement of Torts, § 867, embraced an action for privacy.[21] Tentative Draft No. 13 of the Second Restatement of Torts, §§ 652A–652E, divides the privacy tort into four branches; [22] and with respect to the wrong of giving unwanted publicity about private life, the com-

---

[20] 4 Harv. L. Rev., at 216–217.

[21] Restatement of Torts § 867 (1939).

[22] Restatement (Second) of Torts §§ 652A–652E (Tent. Draft No. 13, Apr. 27, 1967). The four branches are: unreasonable intrusion upon the seclusion of another (§ 652B), appropriation of the other's name or likeness (§ 652C), unreasonable publicity given to the other's private life (§ 652D), and publicity which unreasonably places the other in a false light before the public (§ 652E). See § 652A. The same categorization is suggested in W. Prosser, Law of Torts § 117 (4th ed. 1971); Prosser, Privacy, 48 Calif. L. Rev. 383 (1960).

mentary to § 652D states: "There is no liability when the defendant merely gives further publicity to information about the plaintiff which is already public. Thus there is no liability for giving publicity to facts about the plaintiff's life which are matters of public record . . . ." [23] The same is true of the separate tort of physically or otherwise intruding upon the seclusion or private affairs of another. Section 652B, Comment c, provides that "there is no liability for the examination of a public record concerning the plaintiff, or of documents which the plaintiff is required to keep and make available for public inspection." [24] According to this draft, ascertaining and publishing the contents of public records are simply not within the reach of these kinds of privacy actions.[25]

Thus even the prevailing law of invasion of privacy generally recognizes that the interests in privacy fade

[23] Restatement (Second) of Torts, *supra*, § 652D, Comment c, at 114.

[24] *Id.*, § 652B, Comment c, at 104.

[25] See also W. Prosser, Law of Torts, *supra*, at 810–811. For decisions emphasizing as a defense to actions claiming invasion of privacy the fact that the information in question was derived from official records available to the public, see *Hubbard* v. *Journal Publishing Co.*, 69 N. M. 473, 368 P. 2d 147 (1962) (information regarding sexual assault by a boy upon his younger sister derived from official juvenile-court records open to public inspection); *Edmiston* v. *Time, Inc.*, 257 F. Supp. 22 (SDNY 1966) (fair and true report of court opinion); *Bell* v. *Courier-Journal & Louisville Times Co.*, 402 S. W. 2d 84 (Ky. 1966); *Lamont* v. *Commissioner of Motor Vehicles*, 269 F. Supp. 880 (SDNY), aff'd, 386 F. 2d 449 (CA2 1967), cert. denied, 391 U. S. 915 (1968); *Frith* v. *Associated Press*, 176 F. Supp. 671 (EDSC 1959); *Meetze* v. *Associated Press*, 230 S. C. 330, 95 S. E. 2d 606 (1956); *Thompson* v. *Curtis Publishing Co.*, 193 F. 2d 953 (CA3 1952); *Garner* v. *Triangle Publications*, 97 F. Supp. 546 (SDNY 1951); *Berg* v. *Minneapolis Star & Tribune Co.*, 79 F. Supp. 957 (Minn. 1948).

when the information involved already appears on the public record. The conclusion is compelling when viewed in terms of the First and Fourteenth Amendments and in light of the public interest in a vigorous press. The Georgia cause of action for invasion of privacy through public disclosure of the name of a rape victim imposes sanctions on pure expression—the content of a publication—and not conduct or a combination of speech and nonspeech elements that might otherwise be open to regulation or prohibition. See *United States* v. *O'Brien,* 391 U. S. 367, 376–377 (1968). The publication of truthful information available on the public record contains none of the indicia of those limited categories of expression, such as "fighting" words, which "are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, 572 (1942) (footnote omitted).

By placing the information in the public domain on official court records, the State must be presumed to have concluded that the public interest was thereby being served. Public records by their very nature are of interest to those concerned with the administration of government, and a public benefit is performed by the reporting of the true contents of the records by the media. The freedom of the press to publish that information appears to us to be of critical importance to our type of government in which the citizenry is the final judge of the proper conduct of public business. In preserving that form of government the First and Fourteenth Amendments command nothing less than that the States may not impose sanctions on the publication of truthful information contained in official court records open to public inspection.

We are reluctant to embark on a course that would make public records generally available to the media but forbid their publication if offensive to the sensibilities of the supposed reasonable man. Such a rule would make it very difficult for the media to inform citizens about the public business and yet stay within the law. The rule would invite timidity and self-censorship and very likely lead to the suppression of many items that would otherwise be published and that should be made available to the public. At the very least, the First and Fourteenth Amendments will not allow exposing the press to liability for truthfully publishing information released to the public in official court records. If there are privacy interests to be protected in judicial proceedings, the States must respond by means which avoid public documentation or other exposure of private information. Their political institutions must weigh the interests in privacy with the interests of the public to know and of the press to publish.[26] Once true information is disclosed in public court documents open to public inspection, the press cannot be sanctioned for publishing it. In this instance as in others reliance must rest upon the judgment of those who decide what to publish or broadcast. See *Miami Herald Publishing Co.* v. *Tornillo,* 418 U. S., at 258.

Appellant Wassell based his televised report upon notes taken during the court proceedings and obtained the name of the victim from the indictments handed to him at his request during a recess in the hearing. Appellee has not contended that the name was obtained in an improper fashion or that it was not on an official court document open to public inspection. Under these cir-

---

[26] We mean to imply nothing about any constitutional questions which might arise from a state policy not allowing access by the public and press to various kinds of official records, such as records of juvenile-court proceedings.

cumstances, the protection of freedom of the press provided by the First and Fourteenth Amendments bars the State of Georgia from making appellants' broadcast the basis of civil liability.[27]

*Reversed.*

Mr. Chief Justice Burger concurs in the judgment.

Mr. Justice Powell, concurring.

I join in the Court's opinion, as I agree with the holding and most of its supporting rationale.[1] My understanding of some of our decisions concerning the law of defamation, however, differs from that expressed in today's opinion. Accordingly, I think it appropriate to state separately my views.

I am in entire accord with the Court's determination that the First Amendment proscribes imposition of civil liability in a privacy action predicated on the truthful publication of matters contained in open judicial records. But my impression of the role of truth in defamation actions brought by private citizens differs from the Court's. The Court identifies as an "open" question the issue of "whether the First and Fourteenth Amendments require that truth be recognized as a defense in a defamation action brought by a private person as distin-

[27] Appellants have contended that whether they derived the information in question from public records or instead through their own investigation, the First and Fourteenth Amendments bar any sanctions from being imposed by the State because of the publication. Because appellants have prevailed on more limited grounds, we need not address this broader challenge to the validity of § 26–9901 and of Georgia's right of action for public disclosure.

[1] At the outset, I note my agreement that *Miami Herald Publishing Co.* v. *Tornillo,* 418 U. S. 241 (1974), supports the conclusion that the issue presented in this appeal is final for review. 28 U. S. C. § 1257.

guished from a public official or a public figure." *Ante,* at 490. In my view, our recent decision in *Gertz* v. *Robert Welch, Inc.,* 418 U. S. 323 (1974), largely resolves that issue.

*Gertz* is the most recent of a line of cases in which this Court has sought to resolve the conflict between the State's desire to protect the reputational interests of its citizens and ‑ the competing commands of the First Amendment. In each of the many defamation actions considered in the 10 years following *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964), state law provided that truth was a defense to the action.[2] Today's opinion reiterates what we previously have recognized, see *Garrison* v. *Louisiana,* 379 U. S. 64, 74 (1964)—that the defense of truth is constitutionally required when the subject of the alleged defamation is a public figure. *Ante,* at 489–490. Indeed, even if not explicitly recognized, this determination is implicit in the Court's articulation of a standard of recovery that rests on knowing or

---

[2] In *Time, Inc.* v. *Hill,* 385 U. S. 374 (1967), the Court considered a state cause of action that afforded protection against unwanted publicity rather than damage to reputation through the publication of false statements of fact. In such actions, however, the State also recognized that truth was an absolute defense against liability for publication of reports concerning newsworthy people or events. *Id.,* at 383. The Court's abandonment of the "matter of general or public interest" standard as the determinative factor for deciding whether to apply the *New York Times* malice standard to defamation litigation brought by private individuals, *Gertz* v. *Robert Welch, Inc.,* 418 U. S. 323, 346 (1974); see also *Rosenbloom* v. *Metromedia, Inc.,* 403 U. S. 29, 79 (1971) (MARSHALL, J., dissenting), calls into question the conceptual basis of *Time, Inc.* v. *Hill.* In neither *Gertz* nor our more recent decision in *Cantrell* v. *Forest City Publishing Co.,* 419 U. S. 245 (1974), however, have we been called upon to determine whether a State may constitutionally apply a more relaxed standard of liability under a false-light theory of invasion of privacy. See *id.,* at 250–251; *Gertz, supra,* at 348; *ante,* at 490 n. 19.

reckless disregard of the truth. I think that the constitutional necessity of recognizing a defense of truth is equally implicit in our statement of the permissible standard of liability for the publication or broadcast of defamatory statements whose substance makes apparent the substantial danger of injury to the reputation of a private citizen.

In *Gertz* we held that the First Amendment prohibits the States from imposing strict liability for media publication of allegedly false statements that are claimed to defame a private individual. While providing the required "breathing space" for First Amendment freedoms, the *Gertz* standard affords the States substantial latitude in compensating private individuals for wrongful injury to reputation.[3] "[S]o long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." 418 U. S., at 347. The requirement that the state standard of liability be related to the defendant's failure to avoid publication of "defamatory falsehood" limits the grounds on which a normal action for defamation can be brought. It is fair to say that if the statements are true, the standard contemplated by *Gertz* cannot be satisfied.

In *Gertz* we recognized the need to establish a broad rule of general applicability, acknowledging that such an

---

[3] Our recent opinions dealing with First Amendment limitations on state defamation actions all center around the common premise that while the Constitution requires that false ideas be corrected only by the competitive impact of other ideas, the First Amendment affords no constitutional protection for false statements of fact. See *Gertz, supra,* at 339–340. Beginning with this common assumption, the decisions of this Court have undertaken to identify a standard of care with respect to the truth of the published facts that will afford the required "breathing space" for First Amendment values.

approach necessarily requires treating alike cases that involve differences as well as similarities. *Id.*, at 343–344. Of course, no rule of law is infinitely elastic. In some instances state actions that are denominated actions in defamation may in fact seek to protect citizens from injuries that are quite different from the wrongful damage to reputation flowing from false statements of fact. In such cases, the Constitution may permit a different balance to be struck. And, as today's opinion properly recognizes, causes of action grounded in a State's desire to protect privacy generally implicate interests that are distinct from those protected by defamation actions. But in cases in which the interests sought to be protected are similar to those considered in *Gertz,* I view that opinion as requiring that the truth be recognized as a complete defense.

MR. JUSTICE DOUGLAS, concurring in the judgment.

I agree that the state judgment is "final," and I also agree in the reversal of the Georgia court.* On the

---

*While I join in the narrow result reached by the Court, I write separately to emphasize that I would ground that result upon a far broader proposition, namely, that the First Amendment, made applicable to the States through the Fourteenth, prohibits the use of state law "to impose damages for merely discussing public affairs . . . ." *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 295 (1964) (Black, J., concurring). See also *Cantrell* v. *Forest City Publishing Co.,* 419 U. S. 245, 254 (1974) (DOUGLAS, J., dissenting); *Gertz* v. *Robert Welch, Inc.,* 418 U. S. 323, 355 (1974) (DOUGLAS, J., dissenting); *Time, Inc.* v. *Hill,* 385 U. S. 374, 398 (1967) (Black, J., concurring); *id.,* at 401 (DOUGLAS, J., concurring); *Garrison* v. *Louisiana,* 379 U. S. 64, 80 (1964) (DOUGLAS, J., concurring). In this context, of course, "public affairs" must be broadly construed— indeed, the term may be said to embrace "any matter of sufficient general interest to prompt media coverage . . . ." *Gertz* v. *Robert Welch, Inc., supra,* at 357 n. 6 (DOUGLAS, J., dissenting). By its now-familiar process of balancing and accommodating First Amendment

merits, the case for me is on all fours with *New Jersey State Lottery Comm'n* v. *United States,* 491 F. 2d 219 (CA3 1974), vacated and remanded, *ante,* p. 371. For the reasons I stated in my dissent from our disposition of that case, there is no power on the part of government to suppress or penalize the publication of "news of the day."

MR. JUSTICE REHNQUIST, dissenting.

Because I am of the opinion that the decision which is the subject of this appeal is not a "final" judgment or decree, as that term is used in 28 U. S. C. § 1257, I would dismiss this appeal for want of jurisdiction.

*Radio Station WOW, Inc.* v. *Johnson,* 326 U. S. 120 (1945), established that in a "very few" circumstances review of state-court decisions could be had in this Court even though something "further remain[ed] to be determined by a State court." *Id.,* at 124. Over the years, however, and despite vigorous protest by Mr. Justice Harlan,[1] this Court has steadily discovered new exceptions to the finality requirement, such that they can hardly any longer be described as "very few." Whatever may be the unexpressed reasons for this process of expansion, see, *e. g., Hudson Distributors* v. *Eli Lilly,* 377 U. S. 386, 401 (1964) (Harlan, J., dissenting), it has frequently been the subject of no more formal an express explanation than cursory citations to preceding cases in

---

freedoms with state or individual interests, the Court raises a specter of liability which must inevitably induce self-censorship by the media, thereby inhibiting the rough-and-tumble discourse which the First Amendment so clearly protects.

[1] See *Construction Laborers* v. *Curry,* 371 U. S. 542, 553 (1963); *Mercantile National Bank* v. *Langdeau,* 371 U. S. 555, 572 (1963); *Hudson Distributors* v. *Eli Lilly,* 377 U. S. 386, 395 (1964); *Organization for a Better Austin* v. *Keefe,* 402 U. S. 415, 420 (1971).

the line. Especially is this true of cases in which the Court, as it does today, relies on *Construction Laborers* v. *Curry,* 371 U. S. 542 (1963).[2] Although the Court's opinion today does accord detailed consideration to this problem, I do not believe that the reasons it expresses can support its result.

I

The Court has taken what it terms a "pragmatic" approach to the finality problem presented in this case. In so doing, it has relied heavily on *Gillespie* v. *United States Steel Corp.,* 379 U. S. 148 (1964). As the Court acknowledges, *ante,* at 478 n. 7, *Gillespie* involved 28 U. S. C. § 1291, which restricts the appellate jurisdiction of the federal courts of appeals to "final decisions of the district courts." Although acknowledging this distinction, the Court accords it no importance and adopts *Gillespie*'s approach without any consideration of whether the finality requirement for this Court's jurisdiction over a "judgment or decree" of a state court is grounded on more serious concerns than is the limitation of court of appeals jurisdiction to final "decisions" of the district courts.[3] I believe that the underlying concerns are differ-

---

[2] See, *e. g., American Radio Assn.* v. *Mobile S. S. Assn.,* 419 U. S. 215, 217 n. 1 (1974); *Hudson Distributors* v. *Eli Lilly, supra,* at 389 n. 4.

[3] The textual distinction between §§ 1291 and 1257, the former referring to "final decisions," while the latter refers to "final judgments or decrees," first appeared in the Evarts Act, Act of Mar. 3, 1891, 26 Stat. 826, which created the courts of appeals. Section 6 of that Act provided that courts of appeals should exercise appellate jurisdiction over "final decision" of the federal trial courts. The House version of the Act had referred to "final judgment or decree," 21 Cong. Rec. 3402 (1890), but the Senate Judiciary Committee changed the wording without formal explanation. See *id.,* at 10218. Perhaps significance can be attached to the fact that under the House bill the courts of appeals would have been independent of the federal trial courts, being manned by full-time appellate judges;

ent, and that the difference counsels a more restrictive approach when § 1257 finality is at issue.

According to *Gillespie,* the finality requirement is imposed as a matter of minimizing "the inconvenience and costs of piecemeal review." This proposition is undoubtedly sound so long as one is considering the administration of the federal court system. Were judicial efficiency the only interest at stake there would be less inclination to challenge the Court's resolution in this case, although, as discussed below, I have serious reservations that the standards the Court has formulated are effective for achieving even this single goal. The case before us, however, is an appeal from a state court, and this fact introduces additional interests which must be accommodated in fashioning any exception to the literal application of the finality requirement. I consider § 1257 finality to be but one of a number of congressional provisions reflecting concern that uncontrolled federal judicial interference with state administrative and judicial functions would have untoward consequences for our federal system.[4] This is by no means a novel view of the § 1257 finality requirement. In *Radio Station WOW, Inc.* v. *Johnson,* 326 U. S., at 124, Mr. Justice Frankfurter's

the Senate version, on the other hand, generally provided that court of appeals duties would be performed by the trial judges within each circuit. See § 3, 26 Stat. 827.

The first Judiciary Act, Act of Sept. 24, 1789, 1 Stat. 73, used the terms "judgment" and "decree" in defining the appellate jurisdiction of both the Supreme Court, § 25, and the original circuit courts. § 22.

[4] See, *e. g.,* 28 U. S. C. § 1341 (limitation on power of district courts to enjoin state taxing systems); 28 U. S. C. § 1739 (requiring that state judicial proceedings be accorded full faith and credit in federal courts); 28 U. S. C. §§ 2253–2254 (prescribing various restrictions on federal habeas corpus for state prisoners); 28 U. S. C. § 2281 (three-judge district court requirement); 28 U. S. C. § 2283 (restricting power of federal courts to enjoin state-court proceedings).

opinion for the Court explained the finality requirement as follows:

"This requirement has the support of considerations generally applicable to good judicial administration. It avoids the mischief of economic waste and of delayed justice. Only in very few situations, where intermediate rulings may carry serious public consequences, has there been a departure from this requirement of finality for federal appellate jurisdiction. *This prerequisite to review derives added force when the jurisdiction of this Court is invoked to upset the decision of a State court.* Here we are in the realm of potential conflict between the courts of two different governments. And so, ever since 1789, Congress has granted this Court the power to intervene in State litigation only after 'the highest court of a State in which a decision in the suit could be had' has rendered a 'final judgment or decree.' § 237 of the Judicial Code, 28 U. S. C. § 344 (a). *This requirement is not one of those technicalities to be easily scorned. It is an important factor in the smooth working of our federal system.*" (Emphasis added.)

In *Republic Gas Co.* v. *Oklahoma*, 334 U. S. 62, 67 (1948), Mr. Justice Frankfurter, speaking for the Court, again expressed this view:

"This prerequisite for the exercise of the appellate powers of this Court is especially pertinent when a constitutional barrier is asserted against a State court's decision on matters peculiarly of local concern. Close observance of this limitation upon the Court is not regard for a strangling technicality. History bears ample testimony that it is an important factor in securing harmonious State-federal relations."

That comity and federalism are significant elements of § 1257 finality has been recognized by other members of the Court as well, perhaps most notably by Mr. Justice Harlan. See, e. g., *Hudson Distributors* v. *Eli Lilly*, 377 U. S., at 397–398 (dissenting); *Mercantile National Bank* v. *Langdeau*, 371 U. S. 555, 572 (1963) (dissenting). In the latter dissent, he argued that one basis of the finality rule was that it foreclosed "this Court from passing on constitutional issues that may be dissipated by the final outcome of a case, thus helping to keep to a minimum undesirable federal-state conflicts." One need cast no doubt on the Court's decision in such cases as *Langdeau* to recognize that Mr. Justice Harlan was focusing on a consideration which should be of significance in the Court's disposition of this case.

"Harmonious state-federal relations" are no less important today than when Mr. Justice Frankfurter penned *Radio Station WOW* and *Republic Gas Co.* Indeed, we have in recent years emphasized and re-emphasized the importance of comity and federalism in dealing with a related problem, that of district court interference with ongoing state judicial proceedings. See *Younger* v. *Harris*, 401 U. S. 37 (1971); *Samuels* v. *Mackell*, 401 U. S. 66 (1971). Because these concerns are important, and because they provide "added force" to § 1257's finality requirement, I believe that the Court has erred by simply importing the approach of cases in which the only concern is efficient judicial administration.

## II

But quite apart from the considerations of federalism which counsel against an expansive reading of our jurisdiction under § 1257, the Court's holding today enunciates a virtually formless exception to the finality requirement, one which differs in kind from those previously carved out. By contrast, *Construction Laborers* v. *Curry, supra,*

and *Mercantile National Bank* v. *Langdeau, supra,* are based on the understandable principle that where the proper forum for trying the issue joined in the state courts depends on the resolution of the federal question raised on appeal, sound judicial administration requires that such a question be decided by this Court, if it is to be decided at all, sooner rather than later in the course of the litigation. *Organization for a Better Austin* v. *Keefe,* 402 U. S. 415 (1971), and *Mills* v. *Alabama,* 384 U. S. 214 (1966), rest on the premise that where as a practical matter the state litigation has been concluded by the decision of the State's highest court, the fact that in terms of state procedure the ruling is interlocutory should not bar a determination by this Court of the merits of the federal question.

Still other exceptions, as noted in the Court's opinion, have been made where the federal question decided by the highest court of the State is bound to survive and be presented for decision here regardless of the outcome of future state-court proceedings, *Radio Station WOW, supra; Brady* v. *Maryland,* 373 U. S. 83 (1963), and for the situation in which later review of the federal issue cannot be had, whatever the ultimate outcome of the subsequent proceedings directed by the highest court of the State, *California* v. *Stewart,* 384 U. S. 436 (1966) (decided with *Miranda* v. *Arizona*); *North Dakota State Board of Pharmacy* v. *Snyder's Drug Stores, Inc.,* 414 U. S. 156 (1973). While the totality of these exceptions certainly indicates that the Court has been willing to impart to the language "final judgment or decree" a great deal of flexibility, each of them is arguably consistent with the intent of Congress in enacting § 1257, if not with the language it used, and each of them is relatively workable in practice.

To those established exceptions is now added one so

formless that it cannot be paraphrased, but instead must be quoted:

> "Given these factors—that the litigation could be terminated by our decision on the merits and that a failure to decide the question now will leave the press in Georgia operating in the shadow of the civil and criminal sanctions of a rule of law and a statute the constitutionality of which is in serious doubt—we find that reaching the merits is consistent with the pragmatic approach that we have followed in the past in determining finality." *Ante,* at 486.

There are a number of difficulties with this test. One of them is the Court's willingness to look to the merits. It is not clear from the Court's opinion, however, exactly how great a look at the merits we are to take. On the one hand, the Court emphasizes that if we reverse the Supreme Court of Georgia the litigation will end, *ante,* at 485–486, and it refers to cases in which the federal issue has been decided "arguably wrongly." *Ante,* at 486 n. 13. On the other hand, it claims to look to the merits "only to the extent of determining that the issue is substantial." *Ibid.* If the latter is all the Court means, then the inquiry is no more extensive than is involved when we determine whether a case is appropriate for plenary consideration; but if no more is meant, our decision is just as likely to be a costly intermediate step in the litigation as it is to be the concluding event. If, on the other hand, the Court really intends its doctrine to reach only so far as cases in which our decision in all probability will terminate the litigation, then the Court is reversing the traditional sequence of judicial decisionmaking. Heretofore, it has generally been thought that a court first assumed jurisdiction of a case, and then went on to decide the merits of the questions it presented. But henceforth in deter-

mining our own jurisdiction we may be obliged to determine whether or not we agree with the merits of the decision of the highest court of a State.

Yet another difficulty with the Court's formulation is the problem of transposing to any other case the requirement that "failure to decide the question now will leave the press in Georgia operating in the shadow of the civil and criminal sanctions of a rule of law and a statute the constitutionality of which is in serious doubt." *Ante,* at 486. Assuming that we are to make this determination of "serious doubt" at the time we note probable jurisdiction of such an appeal, is it enough that the highest court of the State has ruled against any federal constitutional claim? If that is the case, then because § 1257 by other language imposes that requirement, we will have completely read out of the statute the limitation of our jurisdiction to a "final judgment or decree." Perhaps the Court's new standard for finality is limited to cases in which a First Amendment freedom is at issue. The language used by Congress, however, certainly provides no basis for preferring the First Amendment, as incorporated by the Fourteenth Amendment, to the various other Amendments which are likewise "incorporated," or indeed for preferring any of the "incorporated" Amendments over the due process and equal protection provisions which are embodied literally in the Fourteenth Amendment.

Another problem is that in applying the second prong of its test, the Court has not engaged in any independent inquiry as to the consequences of permitting the decision of the Supreme Court of Georgia to remain undisturbed pending final state-court resolution of the case. This suggests that in order to invoke the benefit of today's rule, the "shadow" in which an appellant must stand need be neither deep nor wide. In this case nothing more is

at issue than the right to report the name of the victim of a rape. No hindrance of any sort has been imposed on reporting the fact of a rape or the circumstances surrounding it. Yet the Court unquestioningly places this issue on a par with the core First Amendment interest involved in *Miami Herald Publishing Co.* v. *Tornillo,* 418 U. S. 241 (1974), and *Mills* v. *Alabama, supra,* that of protecting the press in its role of providing uninhibited political discourse.[5]

But the greatest difficulty with the test enunciated today is that it totally abandons the principle that constitutional issues are too important to be decided save when absolutely necessary, and are to be avoided if there are grounds for decision of lesser dimension.[6] The long line of cases which established this rule makes clear that it is a principle primarily designed, not to benefit the lower courts, or state-federal relations, but rather to safeguard this Court's own process of constitutional adjudication.

"Considerations of propriety, as well as long-established practice, demand that we refrain from passing upon the constitutionality of an act of Congress unless obliged to do so in the proper performance of our judicial function, when the question is raised

---

[5] As pointed out in *Tornillo,* 418 U. S., at 247 n. 6, not only did uncertainty about Florida's "right of reply" statute interfere with this important press function, but delay by this Court would have left the matter unresolved during the impending 1974 elections. In *Mills,* the Court observed that "there is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs." 384 U. S., at 218.

[6] One important distinction between this case and *Construction Laborers* v. *Curry,* 371 U. S. 542 (1963), has already been discussed, *supra,* at 505–506. Another is that the federal issue here is constitutional, whereas that in *Curry* was statutory.

by a party whose interests entitle him to raise it."
*Blair* v. *United States,* 250 U. S. 273, 279 (1919).

"The Court will not 'anticipate a question of constitutional law in advance of the necessity of deciding it.' *Liverpool, N. Y. & P. S. S. Co.* v. *Emigration Commissioners,* 113 U. S. 33, 39; *Abrams* v. *Van Schaick,* 293 U. S. 188; *Wilshire Oil Co.* v. *United States,* 295 U. S. 100. 'It is not the habit of the Court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case.' *Burton* v. *United States,* 196 U. S. 283, 295." *Ashwander* v. *Tennessee Valley Authority,* 297 U. S. 288, 346–347 (1936) (Brandeis, J., concurring).

In this case there has yet to be an adjudication of liability against appellants, and unlike the appellant in *Mills* v. *Alabama,* they do not concede that they have no nonfederal defenses. Nonetheless, the Court rules on their constitutional defense. Far from eschewing a constitutional holding in advance of the necessity for one, the Court construes § 1257 so that it may virtually rush out and meet the prospective constitutional litigant as he approaches our doors.

### III

This Court is obliged to make preliminary determinations of its jurisdiction at the time it votes to note probable jurisdiction. At that stage of the proceedings, prior to briefing on the merits or oral argument, such determinations must of necessity be based on relatively cursory acquaintance with the record of the proceedings below. The need for an understandable and workable application of a jurisdictional provision such as § 1257 is therefore far greater than for a similar interpretation of statutes dealing with substantive law.[7] We, of course, re-

---

[7] Cf. *United States* v. *Sisson,* 399 U. S. 267, 307 (1970):

"Clarity is to be desired in any statute, but in matters of jurisdic-

tain the authority to dismiss a case for want of a final judgment after having studied briefs on the merits and having heard oral argument, but I can recall not a single instance of such a disposition during the last three Terms of the Court. While in theory this may be explained by saying that during these Terms we have never accorded plenary consideration to a § 1257 case which was not a "final judgment or decree," I would guess it just as accurate to say that after the Court has studied briefs and heard oral argument, it has an understandable tendency to proceed to a decision on the merits in preference to dismissing for want of jurisdiction. It is thus especially disturbing that the rule of this case, unlike the more workable and straightforward exceptions which the Court has previously formulated, will seriously compound the already difficult task of accurately determining, at a preliminary stage, whether an appeal from a state-court judgment is a "final judgment or decree."

A further aspect of the difficulties which the Court is generating is illustrated by a petition for certiorari recently filed in this Court, *Time, Inc.* v. *Firestone,* No. 74–944. The case was twice before the Florida Supreme Court. That court's first decision was rendered in December 1972; it rejected Time's First Amendment defense to a libel action, and remanded for further proceedings on state-law issues. The second decision was rendered in 1974, and dealt with the state-law issues litigated on remand. Before this Court, Time seeks review of the First Amendment defense rejected by the Florida Supreme Court in December 1972. Under the Court's decision today, one could conclude that the 1972 judgment was itself a final decision from which review might

tion it is especially important. Otherwise the courts and the parties must expend great energy, not on the merits of dispute settlement, but on simply deciding whether a court has the power to hear a case."

have been had. If it was, then petitioner Time is confronted by 28 U. S. C. § 2101 (c), which restricts this Court's jurisdiction over state civil cases to those in which review is sought within 90 days of the entry of a reviewable judgment.

I in no way suggest either my own or the Court's views on our jurisdiction over *Time, Inc.* v. *Firestone*. This example is simply illustrative of the difficulties which today's decision poses not only for this Court, but also for a prudent counsel who is faced with an adverse interlocutory ruling by a State's highest court on a federal issue asserted as a dispositive bar to further litigation. I suppose that such counsel would be unwilling to presume that this Court would flout both the meaning of words and the command of Congress by employing loose standards of finality to obtain jurisdiction, but strict ones to prevent its loss. He thus would be compelled to judge his situation in light of today's formless, unworkable exception to the finality requirement. I would expect him frequently to choose to seek immediate review in this Court, solely as a matter of assuring that his federal contentions are not lost for want of timely filing. The inevitable result will be totally unnecessary additions to our docket and serious interruptions and delays of the state adjudicatory process.

Although unable to persuade my Brethren that we do not have in this case a final judgment or decree of the Supreme Court of Georgia, I nonetheless take heart from the fact that we are concerned here with an area in which "*stare decisis* has historically been accorded considerably less than its usual weight." *Gonzalez* v. *Employees Credit Union*, 419 U. S. 90, 95 (1974). I would dismiss for want of jurisdiction.