**Mary ROHDA, Plaintiff,**

v.

**FRANKLIN LIFE INSURANCE COMPANY, et al., Defendants.**

**Civ. A. No. 83–M–1421.**

United States District Court,
D. Colorado.

May 12, 1988.

Patricia Jo Stone, Stone & Associates, Lakewood, Colo., for Rohda.

J.E. Losavio, Jr., Pueblo, Colo., for Roger Blasi.

R. Eric Peterson, White & Steele, Denver, Colo., for Franklin Life.

Frank R. Kennedy, Cooper & Kelley, P.C., Denver, Colo., for Losavio.

Fred M. Winner, Baker & Hostetler, Denver, Colo., for Peterson.

## MEMORANDUM OPINION AND ORDER

MATSCH, District Judge.

### Procedural Posture

Mary Rohda claims she was sexually assaulted by Roger Blasi on March 19, 1981. At the time of the alleged assault, Blasi was employed by Franklin Life Insurance Company. Blasi was prosecuted for the assault in state court and convicted on December 17, 1981. Rohda filed this civil action against Blasi and Franklin Life Insurance Company on August 9, 1983, alleging outrageous conduct, negligent hiring and negligent retention. J.E. Losavio, Blasi's lawyer in the post-trial criminal proceedings and this civil action, moved for a new trial based on newly discovered evidence, some of which was acquired through discovery proceedings conducted in this civil action. The state court conducted an evidentiary hearing on February 11, 1985, and ordered a new trial. Subsequently, the district attorney moved to dismiss the charges against Blasi.

Mary Rohda filed an amended complaint on June 27, 1985, alleging three claims against Losavio and R. Eric Peterson, lawyer for Franklin Life Insurance Company. The eighth claim for relief of the amended complaint alleges that Losavio and Peterson "engaged in extreme and outrageous behavior by conducting discovery in this matter and in the companion criminal case in a secretive, unethical and unprofessional manner", and acted recklessly or with the intent to cause the plaintiff severe emotional distress. In the ninth claim for relief, Rohda alleges that Losavio and Peterson were *negligent* for engaging in the conduct described in the eighth claim for relief. Rohda alleges in the tenth claim for relief that Losavio and Peterson "made public disclosure to third parties, including numerous newspapers, embarrassing private facts about the plaintiff which placed the plaintiff in a false light in the public eye." Losavio and Peterson have moved for summary judgment on these claims. A hearing was held on these motions on April 14, 1988.

### Factual Background

Mary Rohda signed medical releases on November 25, 1983, directed to the following individuals or institutions:

Mary Hennessey

San Luis Valley Comprehensive Community Mutual Health Center

Dr. Raymond J. Manahan

St. Joseph's Hospital, Concordia, Kansas 66901

Dr. Reynaldo C. Soriano

Dr. L.R. Smith

Dr. Sydney Anderson

Patrick T. Rheamue, M.S. San Luis Valley Comprehensive Community Mental Health Center

Kearney Mental Health Center

Dr. Gerald C. Kempthorne

Dr. Jerold A. Huber

Each release directed the person to whom it was addressed to "furnish to any member of the law firm of White and Steele ... any and all medical and hospital records, ... You are further authorized to provide to any member of the above law firm a narrative report, detailing your examinations, treatments and diagnoses." The releases were to be valid for one year.

In addition to those persons and or institutions listed above, Rohda's pastor, John Paul Meyer, drafted a release, dated August 27, 1984, signed by Rohda, which read: "You are authorized to release to attorneys involved in civil action 83M1421 all records pertaining to the counseling, history, pastoral care and treatment" of Mary Rohda. Release forms directed to four drug stores, dated August 27, 1984, signed by Rohda, authorized the release of any and all medical records concerning Rohda's prescriptions to J.E. Losavio.

Once these releases were obtained, Losavio and Peterson began to depose Rohda's counselors, psycologists, physicians and pastor. Rohda was represented by counsel at each of these depositions.

Rohda was deposed in January of 1984. During her deposition, Royce Tolley, who was the associate working with Rhoda's lawyer, Patricia Jo Stone, objected to defendants' lawyers asking about the alleged

sexual assault. In his deposition, Tolley testified that "[W]e called—I believe we called the Magistrate that day," and the Magistrate said that the defendants could ask about the sexual assault. Tolley Deposition, p. 8. When he was asked whether he told Ms. Stone that Magistrate Abram said that plaintiffs' lawyers could not preclude the use of discovery obtained in the civil case for use in the criminal case, Tolley responded:

He [Magistrate Abram] didn't say that exactly. What he told me was: I could not preclude them from questioning anything in the civil case that had to do with the act, even if it was involved in the criminal case. And if they were to use it in the criminal case, that was something we had to worry about, if they did it. And he didn't say that they could use it. He said, if they did, it was something that would have to be addressed then, and I had no right in this case to prevent them from asking questions about what had happened.

Tolley Deposition, p. 9.

Peterson gave answers to interrogatories saying that during Rohda's deposition Magistrate Abram was told of Mr. Tolley's objections and that "It was at that time that Magistrate Abram indicated to Mr. Tolley and to Mr. Losavio that the use of such evidence was proper." R. Eric Peterson's Answers to Interrogatories, dated March 2, 1987, p. 14.

Rohda served a notice of deposition on Blasi at the beginning of May, 1984. Losavio wrote a letter to Stone, dated April 30, 1984, stating that such a deposition was inappropriate given the continuing nature of the criminal matters, and especially since "there is still the possibility for a new trial based on additional evidence which has come forth as a result of this case." Exhibit E to Losavio's Motion for Summary Judgment, filed May 15, 1987.

During the course of discovery, Losavio decided to have Rohda examined by a medical expert because of her claims for severe mental and emotional trauma. Losavio first notified Ms. Stone that he would have Rohda evaluated by an independent doctor when he wrote a letter, dated October 12, 1983, setting a time and place for that independent examination. Dr. Roberts, a psychiatrist, examined Rohda on January 11, 1984. Losavio states that he does not remember exactly what he told Dr. Roberts with respect to examining Mary Rohda. He says that "I believed I asked him to examine Ms. Rohda so that he could form an opinion as to the extent of her medical and psychological illness and the treatment she had undergone and might need to undergo in the future." Losavio's Response to Plaintiff's Interrogatories, dated February 23, 1987, p. 5. Losavio also states that he does not believe that he told Dr. Roberts, prior to his examination of Rohda, that he would be asked to testify in the criminal proceeding. *Id.* at p. 5.

After the hearing on the matter, Peterson filed an affidavit with this court on April 19, 1988. In that affidavit, he states that although aware that arrangements for this examination had been made, he played no role in arranging it and first met Dr. Roberts when his deposition was taken by plaintiff's counsel. Peterson denies any knowledge of any prior professional or other relationship between Dr. Roberts, Losavio or Blasi.

Dr. Roberts had examined Roger Blasi before examining Rohda. Dr. Roberts saw Blasi three times: twice before he met with Rohda, and once afterwards. Deposition of Dr. Roberts, p. 16. Roberts prescribed a hypnotic medication for Blasi, and met with Blasi's wife. Dr. Roberts says of his visits with Blasi that "I think this could best be called a psychiatric evaluation, and the prescription I gave him I think was more because I felt it was medically necessary to help him feel better; but I certainly wasn't treating him in psychotherapy, per se, no." *Id.* at 14. Dr. Roberts stated that he believed he told Mary Rohda that he had also seen Blasi: "I did outline—I noticed in my notes that I said that she understood my role and I explained to her. I really can't recall whether I told her I had seen Blasi. I probably did. Because I usually try and —I understand these implications of these forensic cases, so I usually try and be as

candid with a person as I can about my role." *Id.* at 17. He further stated that "Yes, I know I did, I know I did, because I told her that I—I told her that I had been retained by Mr. Losavio, who obviously was the opposite side, and that I had—I'm sure I told her that I saw Mr. Blasi." *Id.* at 17.

In an affidavit filed June 17, 1987, Mary Rohda states: "I had no knowledge that Dr. Arthur Roberts had treated Roger Blasi and prescribed medication for him. I would not have submitted to being examined by him as a purported independent medical expert in the within case had I known." Affidavit of Mary Rohda, filed June 17, 1987, ¶ 7.

On October 11, 1984, Losavio filed Blasi's motion for a new criminal trial alleging that the new evidence included observations and opinions of mental health professionals who counselled Mary Rohda after the alleged incident with Blasi. Paragraph 4 of the motion stated that "[T]he statements and observations were not available at the time of the original trial due to the privileges that would have been exercised if there had been an attempt to elicit the testimony of these witnesses." The motion, originally set for argument on December 14, 1984, was continued until February 11, 1985. Losavio states in his affidavit filed with his motion for summary judgment that:

I planned to call Dr. Arthur Roberts in person to testify at this hearing. When the matter was continued, Dr. Roberts was not available on the new date, and I consulted with the District Attorney about taking a videotape deposition. We selected a date and I gave notice thereof to the District Attorney and filed a Notice with the Court. The District Attorney informed me that he would not be available, nor would he have a representative attend the deposition, and I could go ahead and take it anyway. The deposition was taken on December 7, 1984, with Dr. Roberts, my paralegal, and myself in attendance. Neither Mr. Peterson nor Mr. Craver were in attendance at that deposition.

The Motion for New Trial was heard on February 11, 1985, and the deposition of Dr. Roberts was utilized at the Motion for New Trial hearing without opposition or objection from the District Attorney. Affidavit of Losavio, p. 3. Included with the motion for a new trial as exhibits were portions of deposition testimony given by Mary Hennesey and Dr. L.R. Smith and an affidavit by Rebecca Davis–Bonaker.

The transcript of the hearing on the motion for new trial reflects the court's concern about Mary Rohda's privilege. In a colloquy with both Peterson and Losavio the judge said:

I am satisfied there has been a waiver of confidentiality and privilege with regard to the civil suit.

Has there been a full waiver? I'm not sure from what has been presented as to the status of that or is it possible that we will find ourselves back in the situation where, if there was a new trial, the State would be in the position of saying she waived as to the civil, but there is nothing to indicate any waiver as to any subsequent criminal trials.

Transcript of Hearing on Motion for New Trial, p. 141.

Losavio responded:

So I don't think that you can waive the privilege in a civil case, as Mary Rohda has done, in an attempt to acquire monetary damages from Mr. Blasi and Franklin Life Insurance Company, but say wait a minute, you can't ever use the privilege in the criminal phase of this if there should be a new trial.

Id. at 142.

Peterson also participated in Blasi's motion for a new trial. He explained his participation in the criminal proceeding on the grounds that the best defense for Franklin Life Insurance Company was to clear Roger Blasi in the criminal proceeding. Peterson views his actions in the criminal proceeding as essential to protecting his client's interest in this civil matter.

The record shows that Rohda's lawyers were aware of the possibility that discovery material from this civil action might be used in Blasi's criminal proceedings. Tol-

ley admits that this was a constant concern of his and Ms. Stone's. In addition, in plaintiff's motion to compel Blasi's deposition, filed May 8, 1984, Stone quoted from Losavio's April 30, 1984 letter: "There is still the possibility for a new trial based on additional evidence which has come forth as a result of this case."

The facts relevant to Rohda's tenth claim for relief center on whether Losavio and/or Peterson disclosed private facts to the media. Losavio states in his affidavit that he had no contact with anybody from the media prior to the hearing for new trial. Peterson, on the other hand, admits to having talked to Clark Secrest of the Denver Post prior to the hearing for the motion for new trial. He says that:

> The only information which I gave to Mr. Secrest was the general allegations of the plaintiff and the allegations and theories of the defense. Mr. Secrest attended the hearing on the motion for new trial and any information which was printed in the Denver Post came by virtue of the testimony which was presented at the hearing.

R. Eric Peterson's Responses to Plaintiff's Interrogatories, dated March 2, 1987, p. 13.

Clark Secrest's affidavit of January 14, 1988, includes paragraph 8, stating:

> I further verified what might occur at said hearing by telephone discussions with Joe E. Losavio, Jr. and R. Eric Peterson who were identified to me as counsel for Mr. Blasi by Marty Schmidt.

Secrest also states that he met with Peterson, Losavio and Marti Schmidt at a hotel poolside prior to the hearing. Secrest executed another affidavit on February 7, 1988, because he believed his first affidavit could be subject to misinterpretation. He states that the only information he obtained from Peterson and Losavio before the criminal matter concerned when and where the court proceedings were going to take place and the nature of the hearing. He further states that:

> Neither Mr. Losavio nor Mr. Peterson ever told me any facts or information concerning Ms. Rohda which was not the subject of pleadings already on file or testimony given in open court.

Both Peterson and Losavio had contact with members of the media after the hearing on the motion for new trial. Losavio asserts that the only public disclosures he made to third parties regarding Mary Rohda were to two newspaper reporters at the conclusion of the hearing on defendant Blasi's motion for a new trial. He claims that those statements were strictly limited to an accurate recitation of only that which was a matter of public record and which had occurred in open court during the hearing on the motion.

With respect to communications to reporters, Peterson states that he "made no improper disclosure to anyone of anything which went on in either this case or in the companion criminal case." Peterson Affidavit, p. 2.

### Defendant Losavio's Motion for Summary Judgment

Losavio asserts that by instituting this suit and seeking monetary damages for emotional harm, Rohda has waived any privilege that she might have had with respect to both this action and the criminal action. C.R.S. § 13–90–107(1)(d) provides that:

> (1) There are particular relations in which it is the policy of the law to encourage confidence and to preserve it inviolate; therefore, a person shall not be examined as a witness in the following cases: (d) a physician, surgeon, or registered professional nurse duly authorized to practice his profession pursuant to the laws of this state or any other state shall not be examined without the consent of his patient as to any information acquired in attending the patient which was necessary to enable him to prescribe or act for the patient ...

This privilege applies to a psychologist under C.R.S. § 13–90–107(1)(g).

■ Under Colorado law a person may expressly or impliedly waive the privilege. The test for determining an implied waiver is "whether the privilege holder has injected his mental condition into the case as the

basis of a claim or an affirmative defense." *Clark v. District Court,* 668 P.2d 3, 9 (Colo.1983). Rohda has impliedly waived the privilege because she has injected her mental condition into the case, as is evident from the nature of her claims against Losavio, and because she consented to having her health care professionals give deposition testimony. She has expressly waived her privilege of confidentiality in her medical records because she executed releases.

What is not clear, however, is whether Rohda has waived her privilege for all purposes. Citing *Metropolitan Life Insurance Company v. Kaufman,* 104 Colo. 13, 87 P.2d 758, 759 (1939), Losavio asserts the waiver is not limited to a particular purpose or person. Losavio reads *Metropolitan Life* too broadly. That case involved the interpretation of a Missouri statute making communications between physician and patient privileged. The Colorado court had the question because a Denver doctor refused to testify in proceedings that the plaintiff, Belsky, had instituted in St. Louis, Missouri. Belsky filed three separate cases against the defendant Metropolitan Life Insurance Company. One of the cases had been tried and was pending on appeal when the issue of the Denver doctor's testimony was presented to the Colorado Supreme Court. In that case, Belsky, without objection, permitted two physicians employed at the Denver hospital during the years involved in the action to testify about his illness. The testimony that Metropolitan Insurance Company sought from the Denver doctor who was refusing to testify related primarily to hospital records from that same Denver hospital. The court held that Belsky's waiver in the action already tried constituted a waiver of the privilege as to the testimony sought from the doctor now refusing to testify since the actions involved similar issues and the same parties. The court explained that because the purpose of the privilege is to encourage confidence, once the patient permits that confidential information to become public at a public trial, the reason for the privilege ceases to exist. The court explained that under Missouri law "a waiver of privilege established through the testimony of one physician extends to all who have attended the patient for the same ailment, regardless of the time of such consultations, attendance or treatments." *Id.* at 16, 87 P.2d 758.

■ While *Metropolitan* contains some general language supporting Losavio's position, the factual circumstances of Belsky's and Rohda's waivers are different. Belsky was the plaintiff in each of the three actions which involved similar issues. Once he waived his privilege in one action, it logically follows that the privilege will have been waived as to all similar actions in which he is the plaintiff suing the same parties. Rohda waived the patient-physician privilege in this civil action, but was not a party in the criminal action and did not waive her privilege or inject her mental or physical condition into that case. *Metropolitan Life Insurance Company* provides little support for Losavio's contention that a waiver is not limited to a particular purpose or person.

Rohda filed her opposition to Losavio's motion for summary judgment on June 17, 1987. Rohda admits that she executed a number of releases and she also participated in or at least her lawyer was present at the depositions of her treating mental health professionals. Rohda insists that these express and implied waivers only authorized the use of that information for this civil action. Rohda also emphasizes that the releases signed for medical records do not authorize Peterson and Losavio to speak to any of plaintiff's health care professionals without plaintiff's presence.

There is some authority to support the contention that Rohda's waiver in this action does not automatically constitute a waiver with respect to all proceedings. Rohda cites two cases which may support her position. In *Metropolitan Life Insurance Company v. Ryan,* 237 Mo.App. 464, 172 S.W.2d 269 (1943), the court considered the scope of a waiver of privileged testimony. Metropolitan Life Insurance Company sought to cancel a policy of disability insurance issued to Ryan on the grounds that Ryan's statements in obtaining the insurance were false and fradulently made. In

support of its position at trial, Metropolitan Life Insurance Company sought to introduce the testimony of a doctor who had been treating Ryan for syphilis. That doctor began treating Ryan prior to the time that the insurance policy was issued to Ryan, although Ryan had stated in his policy that he was in good health and was not in fact being treated for any mental defect or infirmity and had never had syphilis or spinal disease. The trial court ruled that the testimony of the doctor could be excluded on the grounds of privilege under the Missouri statute which provides that:

> The following persons shall be incompetent to testify: a physician or surgeon concerning any information which he may have acquired from any patient while attending him in a professional character, and which information was necessary to enable him to prescribe for such patient as a physician or do any act for him as a surgeon.

Metropolitan Life Insurance Company argued that the testimony of the doctor was no longer protected by the privilege as that privilege had been previously waived. Indeed, four months prior to the trial involving Metropolitan Life Insurance Company, the doctor testified at a hearing in which Ryan was adjudged insane. At that hearing, Ryan was represented by counsel and made no objection to the testimony offered by the doctor. It is upon that hearing that Metropolitan Life Insurance Company claimed that the privilege was waived. The court examined both the statute regarding commitment of someone adjudged to be insane and the statute providing that patient-physician communications were privileged, and held that the lunacy statute clearly contemplated that the patient's attending physician would have to testify as to the patient's physical and mental condition. But the court concluded that the admission of an attending physician's testimony about a patient did not constitute a waiver of the physician's incompetency to testify in subsequent proceedings. In other words, the court concluded that a waiver of the privilege in one case did not constitute a waiver in all subsequent proceedings.

There is one important similarity between *Metropolitan Life* and this case: to commit Ryan to a mental hospital, Ryan's attending physician was required by statute to testify. Similarly, for Mary Rohda to obtain damages for mental pain and suffering, she will probably have to present the testimony of her mental health professionals.

The extent of the waiver of a patient-physician privilege was also considered in *State v. Fontana,* 277 Minn. 286, 152 N.W. 2d 503 (1967). In *Fontana* the defendant refused to enter a plea to a charge of murder, and the court ordered an examination to determine whether he was competent to stand trial. The defendant was determined to be incompetent to stand trial, and was committed to an asylum for "safekeeping and treatment." While the defendant was at this institution, he was examined and treated by a psychiatrist. At some point the doctor and other members of the staff determined that the defendant was competent to stand trial. Defendant was then arraigned, pleaded not guilty by reason of insanity, and relied on the insanity defense at trial.

At trial, the state called the psychiatrist who had been treating the defendant at the institution. The defendant objected to this testimony on the ground that it was based on privileged communications. The trial court permitted the treating psychiatrist to testify. On appeal, the state argued that the defendant waived the physician-patient privilege by asserting the insanity defense and by introducing the testimony of four physicians who had examined him or treated him previously. The Supreme Court of Minnesota rejected the state's contention, and in discussing the uses and abuses of the physician-patient privilege, held that the Minnesota statute was too explicit to allow an interpretation of implied waiver of privilege under the circumstances of the case. The court stated that the statute clearly provided that a physician could not disclose any information derived from attending the patient without the consent of the patient.

The Minnesota statute is indeed very explicit. It provides:

> A licensed physician or surgeon shall not, without the consent of his patient, be allowed to disclose any information or any opinion based thereon which he acquired in attending the patient in his professional capacity, ... and no oral or written waiver of the privilege herein before created shall have any binding force and effect except that the same be made upon the trial or examination where the evidence is offered or received.

The statute recognizes that a waiver may be limited to a particular trial or examination, and that to use any information that is privileged a waiver must be executed for that specific trial or examination in which the evidence is being offered. Colorado's statute does not contain any similar language, though a strict interpretation of the language suggests that the patient must consent each time a physician is examined by someone concerning privileged information. The statute reads:

> A physician ... shall not be examined without the consent of his patient as to any information acquired in attending the patient which was necessary to enable him to prescribe or act for the patient.

In fact, some Colorado decisions contain language that can be read to support this interpretation. In *Clark v. District Court*, 668 P.2d 3 (Colo.1983), the court held that the privilege provided in section 13–90–107 attaches not only to testimonial disclosures in court but also pre-trial discovery of information within the scope of the privilege. The court viewed a waiver as really a form of consent to disclosure, and noted that that consent may be expressed or implied. In determining whether the defendant, Clark, who was one of two defendants in a pending wrongful death action, had waived his privilege with respect to statements made to a psychiatrist, the court looked at how Clark's physical or mental condition had been raised in *the case*. The court noted that Clark did not assert his physical or mental condition as an affirmative defense to the plaintiff's claim of liability.

The court stated that the appropriate inquiry should be whether the privilege holder has injected his physical or mental condition into the case as the basis of a claim or an affirmative defense. Clark had not done so, though he admitted during a deposition in response to questions by opposing counsel that he had been engaged in some kind of treatment for alcohol and drug abuse prior to the time of the acts upon which the plaintiff was suing. The court stated that:

> Clark, the privilege holder, did not place his physical and mental condition in issue. Rather, it was the conservator as plaintiff, who placed Clark's physical and mental condition in issue by alleging his prior mental problems including alcohol and drug abuse, as the basis for her claim for relief against him and the corporation.

Clark had denied those allegations, and had refused to sign a waiver form authorizing the release of treatment records. Based on all this the court held that it was error for the trial court to grant the conservator's motion to compel discovery of Clark's treatment records.

One can read *Clark* broadly to say that in any given proceeding the privilege holder must be the one to inject his mental condition in issue. Rohda never injected her mental condition into the criminal case, nor did she consent to her mental health professionals giving testimony in that matter.

In *People v. District Court*, 719 P.2d 722 (Colo.1986), the court held that the rule in *Clark* making an express or implied waiver the only basis for authorizing a disclosure of confidential information once the psychologist-patient privilege attaches was just as applicable in a criminal case where the defendant had a countervailing constitutional right to confrontation. The defendant, charged with sexual assault, asserted that the victim would waive her statutory privilege if she decided to testify at trial as to the specifics of the alleged sexual assault. The court disagreed with the defendant, and held that there was no basis for presuming that by testifying at

trial the victim would inject her mental condition into the case. The court also rejected the defendant's argument that he was entitled to the records of the victim because the victim might have told her therapist a different version of the events relating to the sexual assault than had been disclosed to police officers. The court stated:

> The vague assertion that the victim may have made statements to her therapist that might possibly differ from the victim's anticipated trial testimony does not provide a sufficient basis to justify ignoring the victim's right to rely upon her statutory privilege. In view of the strong policy embodied in the statute, the limitation it imposes on the scope of cross-examination is justified.

*Id.* at 726. The court further stated that:

> There is a strong public policy interest in encouraging victims of sexual assaults to obtain meaningful psychotherapy. The defendant's constitutional right to confrontation is not so pervasive as to place sexual assault victims in the untenable position of requiring them to choose whether to testify against an assailant or retain the statutory right of confidentiality in post-assault psychotherapy records.

*Id.,* at 727.

While the facts of *People v. District Court* are different, the court's recognition of the importance of the privilege provides some support for Rohda's contention that a waiver may be limited.

■ In *Bond v. District Court,* 682 P.2d 33 (Colo.1984), the court ordered a trial judge to balance a family's interest in protecting the confidentiality of the notes and records made by their therapists during psychological evaluations and psychiatric care and treatment against the defendant's interest in obtaining evidence to contest damage claims for mental pain and suffering. The court concluded that the plaintiffs had waived their privilege by seeking damages for mental suffering and expenses for psychiatric care; but that waiver did not preclude them from asserting that revelation of detailed disclosures would adversely affect treatment. In

reaching this result, the court noted that the policy underlying the physician-patient privilege is even more compelling in the therapist-patient relationship. Such a balancing of interests could have been considered in this case if the plaintiff had moved for a protective order under F.R. Civ.P. 26(c) to limit use of the information obtained during discovery. The failure to do so does not, however, expand the scope of the waiver. In this court's view, Mr. Losavio incorrectly advised the state judge that Rohda's privilege had been waived. That view of law is not, however, a basis for liability, in itself. A lawyer may make such a mistake, with impunity, if he acted in good faith.

Losavio asserts that unless Rohda can show that he and Peterson were exploiting this civil litigation solely to assist litigation in the criminal forum then they are entitled to the full use of information obtained through discovery in this civil action. *See, Williams v. Johnson & Johnson,* 50 F.R.D. 31 (S.D.N.Y.1970). In *Williams,* the court refused to enter a protective order forbidding a plaintiff from selling materials that came from the defendant through the discovery process to other persons not directly connected with the litigation. The court stated that since the plaintiffs were not engaging in the litigation solely to exploit the discovery process, and since they were pursuing legitimate claims, the defendants were not entitled to a protective order. No privilege was involved. Losavio could not have obtained this information about Rohda as a witness in the criminal case against Blasi. That inability may support an inference that his civil discovery tactics were designed to aid Blasi's motion for a new trial by discrediting Rohda as a witness rather than to defend against her damage claims. The selection of Dr. Roberts to do a psychiatric evaluation suggests a possible motive to destroy the credibility of the complaining witness since he had previously interviewed Blasi, was experienced as a forensic psychiatrist in criminal cases and had a transcript of the trial testimony.

■ Under Colorado law, an attorney owes a duty to his adversary not to engage

in fraudulent or malicious conduct or to commit intentional torts. *Allied Financial Services, Inc. v. Easley*, 676 F.2d 422 (10th Cir.1982). Rohda is Losavio's adversary in this civil action and, accordingly, he owes her a duty not to act maliciously or fraudulently. Whether Losavio engaged in malicious or fraudulent conduct by exploiting the discovery process, especially in failing to inform Rohda that Dr. Roberts had previously examined Blasi and that he would testify in the criminal proceedings before making his report on Rohda available, is a difficult fact question involving subjective intent provable by circumstantial evidence. The factual allegations in the eighth and ninth claims for relief, taken together, are deemed to state a claim based on *Allied Financial Services*, and there is an adequate showing of evidentiary support to avoid summary judgment.

■ The law recognizes a privilege to exercise legal rights as a defense to claims of negligence or outrageous conduct. A comment to Section 46 of the *Restatement (Second) of Torts*, articulates the privilege as follows:

> The conduct although it would otherwise be extreme and outrageous, may be privileged under the circumstances. The actor is never liable, for example, where he has done no more than to insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress.

■ Blasi, of course, had a legal right to move for a new trial and his lawyer had a privilege to pursue that right. The limit of that privilege is the duty Losavio owed to the plaintiff in this case. Accordingly, no separate claim for outrageous conduct or negligence will be recognized.

Mary Rohda's tenth claim for relief is based on invasion of privacy. The *Restatement (Second) of Torts*, Section 652A, provides that:

> (1) One who invades the right of privacy of another is subject to liability for the resulting harm to the interests of the other.

> (2) The right or privacy is invaded by
>
> \*    \*    \*    \*    \*    \*
>
> (c) unreasonable publicity given to the other's private life, as stated in § 652D; or
>
> (d) publicity that unreasonably places the other in a false light before the public, as stated in § 652E.

Section 652D, titled Publicity Given to Private Life, states that:

> One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that
>
> (a) would be highly offensive to a reasonable person, and
>
> (b) is not of legitimate concern to the public.

Section 652E, titled Publicity Placing Person in False Light, states that:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
>
> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
>
> (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

■ Losavio, focusing on 652D, argues that he can not be held liable for an invasion of Rohda's privacy since the only information he ever gave to members of the media was public, having already been disclosed in open court during the criminal proceeding. As stated in Comment b to section 652D, when information has been made public, a party will not be held liable for a claim of invasion of privacy. Losavio argues in the alternative that any statements made by him were absolutely privileged. He cites to *Restatement (Second) of Torts* § 586 which states that:

> An attorney at law is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceed-

ing, or in the institution of, or during the course and as part of, a judicial proceeding in which he participates as counsel, if it has some relation to the proceeding. Since the rules of absolute privilege to publish defamatory materials apply to the publication of any matter that is an invasion of privacy, Rohda's tenth claim for relief is dismissed. Moreover, at least with respect to a claim based on Section 652D, publicity given to private life, the matters disclosed were of legitimate public concern as a matter of law. *See, e.g., Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 329 (1975) (holding unconstitutional a state decision awarding damages against a broadcasting company for invasion of privacy by disclosing the name of a rape victim in violation of a state statute which prohibited such disclosures).

### *Defendant Peterson's Motion for Summary Judgment*

Viewing Rohda's eighth and ninth claims for relief as stating a claim against Peterson for malicious and fraudulent conduct, this court concludes that Rohda has presented sufficient evidence to withstand a motion for summary judgment by Peterson as well as Losavio. Despite Peterson's assertions to the contrary, there is sufficient circumstantial evidence to create a question of fact as to whether discovery was conducted fraudulently or maliciously. In his motion for summary judgment, Peterson states that plaintiff's attorneys knew all along that "it was the manifest intent of defendants Losavio and Peterson to gather evidence in the civil case for use in the criminal trial." That admission is suggestive of an intent to abuse the discovery process.

Peterson's motion for summary judgment on Rohda's tenth claim for relief is granted because his statements were privileged.

The trial of the claims against Losavio and Peterson for damages from fraudulent or malicious conduct in the course of litigation should be separated from the trial of the plaintiff's claims against Blasi and Franklin Life Insurance Company for many reasons, including the fact that the lawyers for the plaintiff and those defendants will be witnesses. Those claims are secondary and arose during the course of this lawsuit. Under F.R.Civ.P. 42(b) separate trials are required and the primary claims should be tried first.

Upon the foregoing, it is

ORDERED that the plaintiff's eighth and ninth claims for relief are construed as a claim for damages from a breach of the lawyer's duty to his adversary to refrain from fraudulent or malicious conduct in the course of litigation, and J.E. Losavio and R. Eric Peterson's motions for summary judgment on that claim for relief are denied, and it is

FURTHER ORDERED that J.E. Losavio and R. Eric Peterson's motions for summary judgment on Rohda's tenth claim for relief are granted, and it is

FURTHER ORDERED that the claims against Roger Blasi and Franklin Life Insurance Company will be tried separately from the claims against J.E. Losavio and R. Eric Peterson, and it is

FURTHER ORDERED that a pre-trial conference shall be convened on June 22, 1988 at 8:00 a.m. in the Conference Room, Second Floor, Post Office Building, 18th and Stout Streets, Denver, Colorado, to prepare for a trial of the plaintiff's claims against Roger Blasi and Franklin Life Insurance Company.