971 A.2d 975

**John DOE**

v.

**DEPARTMENT OF PUBLIC SAFETY AND
CORRECTIONAL SERVICES.**

**No. 00022, Sept. Term, 2008.**

Court of Special Appeals of Maryland.

May 12, 2009.

626

628

Flynn M. Owens (Rubin & Ownes on the brief), Baltimore, for appellant.

Stuart M. Nathan (Douglas F. Gansler, Attorney General on the brief), Baltimore, for appellee.

Panel: WRIGHT, GRAEFF, CHARLES E. MOYLAN, JR. (Retired, specially assigned), JJ.

WRIGHT, J.

This appeal presents a constitutional challenge to Maryland's sex offender registration law. The Circuit Court for Baltimore City rejected appellant John Doe's contention that forcing him to register with local law enforcement every six months for the remainder of his life, without a showing of present or future dangerousness, violated his procedural due process, equal protection, and privacy rights under both the United States and the Maryland Constitutions. For the reasons that follow, we affirm.

## Facts and Procedural History

On February 8, 1977, John Doe was convicted of rape in Baltimore County Circuit Court and sentenced to thirty years imprisonment. He was paroled on September 21, 1995, but violated his parole[1] and was returned to prison before being released on mandatory supervision on September 21, 1998. The period of mandatory supervision expired on April 9, 2007. Because he was under supervision on October 1, 2001, Doe was required to register as a sex offender, and had done so.

John Doe objects to the registration requirement contending that, at age 57, he poses no danger to the community. He cites the following facts to show that he has integrated into society: he has been married for ten years, has two children, owns a home, is employed, and attends community college. Doe filed a declaratory judgment action in the Circuit Court for Baltimore City on April 16, 2007, seeking a declaration that it is unconstitutional to require him to register as a sex offender for the rest of his life. He argues that, because the law does not require a showing that the registrant poses a risk of recidivism, it violates his procedural due process, equal protection, and privacy rights under both the United States and Maryland constitutions. Appellee, the Department of Public Safety and Correctional Services, filed a motion for summary judgment noting that there are no factual issues in

---

1. The reasons for the violation are unknown.

dispute in this case. The circuit court granted the motion after a hearing. Doe timely appealed to this Court on March 10, 2008.

## Discussion

Every state in the United States has some type of sex offender registration law. *See Smith v. Doe*, 538 U.S. 84, 90, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003) ("By 1996, every State, the District of Columbia, and the Federal Government had enacted some [type] of [sex offender registration law]."). This development was encouraged by the federal government, which conditioned a state's continued receipt of some federal crime-fighting funds on the passage of such a law. *See* 42 U.S.C. § 14071 (originally passed as the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Act, Title 17, 108 Stat.2038). Maryland's law requires a "sexually violent offender" to register in person with local law enforcement every six months for the remainder of his life.[2] Md.Code (2001, 2008 Repl.Vol.), Criminal Procedure Article ("CP"), § 11–707(a)(2)(i). A "sexually violent offender" is defined to include anyone convicted of a "sexually violent offense," or an attempt to commit such an offense. CP § 11–701(j). The term "sexually violent offense" includes a violation of Md.Code (2002), Criminal Law Article ("CL"), § 3–303(a), which forbids "engag[ing] in vaginal intercourse with another by force, or the threat of force, without the consent of the other." *See* CP § 11–701(k). In other words, anyone convicted of rape falls within the category of a "sexually violent offender" for the remainder of his life. Although John Doe was convicted in 1977 and the statute was not enacted until 2001, it is to "be applied retroactively to include a registrant convicted of an offense committed before July 1, 1997, and

---

**2.** We use the male pronouns throughout this opinion because the vast majority of sex offenders are, in fact, male. *See, e.g.,* Geneva Adkins *et al.,* Iowa Dept. of Human Rights, The Iowa Sex Offender Registry and Recidivism 6 (Dec.2000) (noting that only 3–4% of Iowa's sex offender population was female, and that "national data [suggests that] Caucasian males are the primary perpetrators of sex crimes.").

who is under the custody or supervision of a supervising authority on October 1, 2001." CP § 11–702.1(a).

## I. Procedural Due Process

Doe cites a footnote in *Young v. State,* 370 Md. 686, 806 A.2d 233 (2002), in which the Court of Appeals, in dicta, noted that the sex offender registration law might violate procedural due process:

> [T]he petition for certiorari in the case sub judice raised only the issue of whether the registration statute was a punitive one, triggering the criminal due process protections of *Apprendi,* and not the issue of whether registration and notification under the statute meet the requirements of civil due process pursuant to the balancing test enunciated in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), and its progeny. We do not, therefore, address the issue of whether the Due Process Clause of the Fourteenth Amendment requires a particularized risk assessment of each registrant, pursuant to specific procedures, to determine which statutorily eligible offenders pose a risk to the community prior to registration, notification, and Internet dissemination. *Cf. Doe v. Attorney Gen.,* 426 Mass. 136, 686 N.E.2d 1007, 1014 (Mass.1997) ("[A registrant] is entitled to a hearing and a determination as to . . . whether sex offender information concerning him should be available on request.").

Our conclusion that § 792 is not punitive and does not violate the strictures of *Apprendi* should not be construed as holding that the sex offender registration and community notification statute does not violate due process in any way, particularly in light of the newly initiated Internet notification, which threatens widespread disclosure of highly personal data and may implicate social ostracism, loss of employment opportunities, and possibly verbal and physical harassment. It is arguable that widespread Internet community notification stigmatizes registrants and implicates liberty and privacy interests that would satisfy the "stigma plus" test utilized to analyze civil due process challenges in

many of the federal circuits, therefore requiring certain procedural due process protections beyond those provided in the statute prior to community notification. *See, e.g., Noble v. Board of Parole and Post–Prison Supervision,* 327 Ore. 485, 964 P.2d 990 (1998) (holding that the parole board's designation of an individual as a "predatory sex offender" for the purpose of the Oregon community notification statute implicated a liberty interest entitling a sex offender, as a matter of procedural due process, to notice and a hearing prior to designation); *United States Dep't of Justice v. Reporters Comm. for Freedom of the Press,* 489 U.S. 749, 762, 109 S.Ct. 1468, 1476, 103 L.Ed.2d 774 (1989) (recognizing a privacy right in the "individual interest in avoiding disclosure of personal matters," even if such information is available in public records); *Paul v. Davis,* 424 U.S. 693, 706, 96 S.Ct. 1155, 1163, 47 L.Ed.2d 405 (1976); *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 514, 27 L.Ed.2d 515 (1971); *Doe,* 426 Mass. 136, 686 N.E.2d at 1013–14 (discussing privacy interests in information that is publically available); Wayne A. Logan, *Liberty Interests in the Preventive State: Procedural Due Process and Sex Offender Community Notification Laws,* 89 J. CRIM. L. & CRIMINOLOGY 1167, 1176 n. 45 (1999); *see generally Shields v. Burge,* 874 F.2d 1201, 1209 (7th Cir.1989) (referring to privacy interests in "confidentiality" and "autonomy").

*Id.* at 718 n. 13, 806 A.2d 233.

A year after the *Young* decision, however, the Supreme Court addressed the issue of whether Connecticut's sex offender registration statute violated the procedural due process protections of the Fourteenth Amendment. *Connecticut Dep't of Pub. Safety v. Doe,* 538 U.S. 1, 123 S.Ct. 1160, 155 L.Ed.2d 98 (2003). *Connecticut DPS* overturned the Second Circuit's decision that "the Due Process Clause entitles [registrants] to a hearing 'to determine whether or not they are particularly likely to be currently dangerous before being labeled as such by their inclusion in a publicly disseminated registry.'" *Id.* at

6, 123 S.Ct. 1160 (quoting *Doe v. Dep't of Pub. Safety ex rel. Lee,* 271 F.3d 38, 62 (2d Cir.2001)). The Supreme Court held:

> [E]ven assuming, *arguendo,* that respondent has been deprived of a liberty interest, due process does not entitle him to a hearing to establish a fact that is not material under the Connecticut statute.
>
> [Although] we [have] held that due process required the government to accord the plaintiff a hearing to prove or disprove a particular fact or set of facts[,] . . . in each of these cases, the fact in question was concededly relevant to the inquiry at hand. Here, however, the fact that respondent seeks to prove—that he is not currently dangerous—is of no consequence under Connecticut's [sex offender registration law]. As the [Department of Public Safety] Website explains, the law's requirements turn on an offender's conviction alone—a fact that a convicted offender has already had a procedurally safeguarded opportunity to contest. 271 F.3d at 44 (" 'Individuals included within the registry are included *solely* by virtue of their conviction record and state law' " (emphasis added)). . . .
>
> In short, even if respondent could prove that he is not likely to be currently dangerous, Connecticut has decided that the registry information of all sex offenders—currently dangerous or not—must be publicly disclosed. Unless respondent can show that that *substantive* rule of law is defective (by conflicting with a provision of the Constitution), any hearing on current dangerousness is a bootless exercise. . . . States are not barred by principles of "procedural due process" from drawing such classifications. *Michael H. v. Gerald D.,* 491 U.S. 110, 120, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989) (plurality opinion) (emphasis in original). . . . Because the question is not properly before us, we express no opinion as to whether Connecticut's [ ] Law violates principles of substantive due process.

538 U.S. at 7–8, 123 S.Ct. 1160.

■ In other words, the statute conclusively presumes that anyone convicted of a sex offense is dangerous, so it is the fact

of conviction that is relevant, not dangerousness itself. The Supreme Court has held that this presumption is permissible. *See Smith, supra,* 538 U.S. at 103, 123 S.Ct. 1140 (holding that "Alaska could conclude that a conviction for a sex offense provides evidence of substantial risk of recidivism," without any specific finding of future dangerousness). If the statute had nothing to do with dangerousness, it would have no rational purpose, because it would not help ensure public safety to force registration on people who pose no harm to society. Thus, if the conclusive presumption violates Doe's substantive due process or 'equal protection rights, he may have a claim. But his claim is not one of procedural due process.

Appellant attempts to distinguish this case from *Connecticut DPS* by pointing out that the internet site used by the Connecticut Department of Public Safety has a disclaimer, clarifying to the public that:

> The Department of Public Safety has not considered or assessed the specific risk of re-offense with regard to any individual prior to his or her inclusion within this registry, and has made no determination that any individual included in the registry is currently dangerous. Individuals included within the registry are included solely by virtue of their conviction record and state law. The main purpose of providing this data on the Internet is to make the information more easily available and accessible, not to warn about any specific individual.

http://www.ct.gov/dps/cwp/view.asp?a=2157 & q=294474. The Maryland site has no such disclaimer, either on the website or as part of the "Terms and Conditions" for its use. But, although the Supreme Court made brief mention of the disclaimer in its opinion, *see id.* at 5, 123 S.Ct. 1160 the requirements of the statute, not the disclaimer, was the basis for the Court's decision. The Maryland statute is not distinguishable from the Connecticut statute.

 Appellant urges us to interpret Article 24 of the Maryland Declaration of Rights more broadly than the Fourteenth

Amendment, and hold that additional process is required before a sex offender can be added to the Maryland registry. Article 24, which provides that "no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land," is *in pari materia* with the Due Process Clause of the Fourteenth Amendment. *See Dua v. Comcast Cable of Md., Inc.*, 370 Md. 604, 628, 805 A.2d 1061 (2002). Therefore, we decline to interpret Article 24 more expansively in this case, as we are persuaded by the reasoning in *Connecticut DPS*. Like the Supreme Court in *Connecticut DPS*, we note that John Doe has not brought a substantive due process claim, and does not express any opinion on that issue. *See Connecticut DPS, supra,* 538 U.S. at 8, 123 S.Ct. 1160.

## II. Equal Protection

We turn next to appellant's equal protection claim, brought under both the Fourteenth Amendment and Article 24. He argues that the statute is arbitrary because it lumps all past offenders together, regardless of their actual dangerousness. As a result, Doe contends, the statute violates his right to equal protection of the laws.

"Although the Maryland Constitution does not contain an express guarantee of equal protection of the laws, it is well established that Article 24 embodies the same equal protection concepts found in the Fourteenth Amendment to the U.S. Constitution." *Verzi v. Baltimore County,* 333 Md. 411, 417, 635 A.2d 967 (1994) (citing *Kirsch v. Prince George's County,* 331 Md. 89, 96, 626 A.2d 372 (1993)) (additional citations omitted). The basic concept behind equal protection is that, when the government decides to treat people differently based on a particular characteristic, its distinctions must be justified. *See, e.g., McLaughlin v. Florida,* 379 U.S. 184, 191, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964) (holding that the court must determine "whether the classifications drawn in a statute are reasonable in light of its purpose"). The level of justifica-

tion required varies; if the government distinguishes based on a suspect class, or if a fundamental right is involved, strict scrutiny must be applied, and the government must show that the classification "under review is 'narrowly tailored' to achieve a 'compelling' government interest." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 127 S.Ct. 2738, 168 L.Ed.2d 508 (2007) (quoting *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995)).[3] Otherwise, we will apply rational basis review, and the burden is on the challenger to negate "any reasonably conceivable state of facts that could provide a rational basis for the classification." *Bd. of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 366, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001) (citations omitted). There need only be a "rational relationship between the disparity of treatment and some legitimate governmental purpose." *Id.* (Citations omitted).

## A. Level of Scrutiny

The Supreme Court has established that the "suspect classes" to which strict scrutiny applies are race, nationality, and alienage. *See Richmond v. J.A. Croson Co.*, 488 U.S. 469, 494, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) ("The highly suspect nature of classifications based on race, nationality, or

---

**3.** An exception applies when the distinction is based on gender, in which case the court will apply a different, intermediate level of scrutiny. *See, e.g., United States v. Virginia*, 518 U.S. 515, 532–33, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) ("To summarize the Court's current directions for cases of official classification based on gender: Focusing on the differential treatment or denial of opportunity for which relief is sought, the reviewing court must determine whether the proffered justification is 'exceedingly persuasive.' The burden of justification is demanding and it rests entirely on the State. *See Mississippi Univ. for Women*, 458 U.S. [718,] 724, 102 S.Ct. 3331, 73 L.Ed.2d 1090 | (1982) ]. The State must show 'at least that the [challenged] classification serves "important governmental objectives and that the discriminatory means employed" are "substantially related to the achievement of those objectives." ' *Ibid.* (quoting *Wengler v. Druggists Mut. Ins. Co.*, 446 U.S. 142, 150, 100 S.Ct. 1540, 64 L.Ed.2d 107 (1980).''). Because Doe does not allege gender discrimination, we will say no more of intermediate scrutiny.

alienage is well established." (Quoting *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 105, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (Marshall, J., dissenting) (footnotes omitted)). This is because those particular groups have been "saddled with [ ] disabilities, or subjected to [ ] a history of purposeful unequal treatment, or relegated to [ ] a position of political powerlessness," and therefore "command extraordinary protection from the majoritarian political process." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). One could certainly argue that sex offenders are saddled with disabilities, such as the requirement that they register for life, and that they are politically powerless, since society reviles them and treats them as pariahs. *See, e.g.*, Dave Newbart, *Registry Won't Stop Sex Crime, Offenders Say*, Chicago Tribune, Dec. 22, 1997, at M1 (discussing a study conducted on the opinions of sex offenders); the researcher noted: "They know that society thinks they are scum."); Andre Henderson, *More Sexual Offenders Serving Time: Increased Reporting of Crimes Leads to Increasing Prison Population*, Milwaukee Journal Sentinel, Sept. 24, 1995, at A20 ("Few members of society are as reviled as sex offenders.").

■ Yet unlike the people in the established suspect classes, who are members of the class because of an accident of birth, people classified as sex offenders had control over whether to become a class member. *See Kahn v. Shevin*, 416 U.S. 351, 357, 94 S.Ct. 1734, 40 L.Ed.2d 189 (1974) (Brennan, J., dissenting) (noting that classifications requiring strict scrutiny are "generally [based on] immutable characteristics over which individuals have little or no control"). Their situation is similar to that of the illegal aliens in *Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982), whom the Supreme Court held are not a suspect class because undocumented status is not an "immutable characteristic." *Id.* at 220. Instead, it is "the product of conscious, indeed unlawful, action." *Id.* Although some would argue that sex offenders are born with their sexual proclivities, or develop them early in life, we must assume that they possess the ability to refrain from

*acting* on them in a way that harms others. Because their voluntary actions put them in the disfavored class, we hold that the "sex offender" class is not suspect.

 We now turn to whether the registration statute implicates a fundamental right.

> Fundamental rights or interests are those "explicitly or implicitly guaranteed" by the federal constitution, *San Antonio School Dist. v. Rodriguez,* 411 U.S. 1, 33–34, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); *see Police Department of Chicago v. Mosley,* 408 U.S. 92, 101, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) (first amendment rights), and they, as presently delineated by the Supreme Court, include the right to vote, *Harper v. Virginia Bd. of Elections,* 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), the right of interstate travel, *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), the right of equal access to a criminal appeal, *Griffin v. Illinois,* 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956), and the right to procreate, *Skinner v. Oklahoma ex rel Williamson,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942). *See also Zablocki v. Redhail,* 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978) (plurality) (right to marry "fundamental"; statute restricting right received "critical examination").

*Attorney Gen. of Md. v. Waldron,* 289 Md. 683, 706, 426 A.2d 929 (1981).

 In order to be characterized as fundamental, a right must be "deeply rooted in this Nation's history and tradition," *Moore v. East Cleveland,* 431 U.S. 494, 503, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977), and so "implicit in the concept of ordered liberty," that "neither liberty nor justice would exist if [it was] sacrificed." *Palko v. Connecticut,* 302 U.S. 319, 325, 326, 58 S.Ct. 149, 82 L.Ed. 288 (1937). The only "fundamental right" identified by Doe is the right to privacy, in Section IV, *infra,* which we conclude is not implicated by the statute. Therefore, we hold that rational basis review should be applied.

*B. Rational Basis Review*

 Under rational basis review, "a court 'will not over-turn' the classification 'unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that the [governmental] actions were irrational.'" *Murphy v. Edmonds*, 325 Md. 342, 355, 601 A.2d 102 (1992) (quoting *Vance v. Bradley*, 440 U.S. 93, 97, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979)) (additional citations omitted). Doe concedes that the statute has a rational purpose—protecting public safety. But, he argues that "lumping [him] in" with dangerous sex offenders is so unjust, and using a past conviction as a proxy for dangerousness is so over-broad, that the statute is irrational. We disagree.

 First, we note that the statute does not "lump together" all people who have committed a sex offense. Rather, it makes distinctions between different types of offenders, labeling them as "offenders," "child sex offenders," "sexually violent offenders," and "sexually violent predators," and subjecting each category to differing levels of regulation. Doe makes no allegation that he has been placed into the wrong category, or that he is being treated any differently than others labeled as sexually violent offenders. Second, the mere fact that a statute is both under-inclusive and over-inclusive, is not, without more, enough to invalidate it under this level of scrutiny. *See Conaway v. Deane*, 401 Md. 219, 323, 932 A.2d 571 (2007) ("In light of the deference owed to the General Assembly under rational basis review, we shall not declare Family Law § 2–201 unconstitutional, even though it may be under-or over-inclusive, or otherwise create a distinction based on imperfectly drawn criteria.").

 Regardless of whether Doe himself is dangerous, the fact that Doe has been convicted of a sex crime makes it *statistically* more likely that he will commit a sex crime in the future. While sex offenders are less likely than others released from prison to commit another crime, they are more likely than either the general public or their fellow releasees

to be convicted of a new sex crime.[4] Therefore, the legislature's decision to use a prior conviction as the sole basis for deciding whether someone must be included in the registry, regardless of whether there is any specific evidence of sexual dangerousness, is not irrational. Nor does the fact that the legislature did not create an "assaulter registry" make the sex offender registry irrational. "Normally, the widest discretion is allowed the legislative judgment in determining whether to attack some, rather than all, of the manifestations of the evil aimed at; and normally that judgment is given the benefit of every conceivable circumstance which might suffice to characterize the classification as reasonable rather than arbitrary and invidious." *McLaughlin, supra,* 379 U.S. at 191, 85 S.Ct. 283 (citations omitted). Again, even though it is clear, given the low rate of recidivism for sex crimes, that the statute will force some people to bear the indignity of registration long after they may have ceased to be a danger to anyone, that is not enough for this Court to overturn the decision of the Legislature in this case. We hold that the statute does have a rational basis.

## IV. The Right to Privacy

In *Roe v. Wade,* 410 U.S. 113, 152–53, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (emphasis added), the Supreme Court stated:

---

4. According to the Bureau of Justice Statistics: "Compared to non-sex offenders released from State prison, sex offenders had a lower overall re-arrest rate." U.S. Dept. of Justice, *Recidivism of Sex Offenders Released from Prison in 1994* 2 (Nov.2003), *available at* http://www.ojp. usdoj.gov/bjs/pub/pdf/rsorp94.pdf. Their re-arrest rate for all crimes was 43%, compared to 68% for all releasees. Sex offenders were more likely than non-sex offenders to be rearrested for sex crimes, however, at 5.3% and 1.3% respectively. We take judicial notice of the fact that the population of the United States in 1994 was over two hundred and sixty million, and note that there were between 60,000–70,000 arrests for sex crimes that year. *See* Wendy Koch, *Despite High-Profile Cases, Sex-Offense Crimes Decline,* USA Today, Aug. 24, 2005, at A1 available at http://www.usat oday.com/news/nation/2005–08–24–sex–crimes–cover_x.htm. We use these numbers to—very roughly—estimate that less than .023% of the population commits sex crimes.

The Constitution does not explicitly mention any right of privacy. In a line of decisions, however, going back perhaps as far as *Union Pacific R. Co. v. Botsford,* 141 U.S. 250, 251, 11 S.Ct. 1000, 35 L.Ed. 734 (1891), **the Court has recognized that a right of personal privacy, or a guarantee of certain areas or zones of privacy, does exist under the Constitution.** In varying contexts, the Court or individual Justices have, indeed, found at least the roots of that right in the First Amendment, *Stanley v. Georgia,* 394 U.S. 557, 564, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969); in the Fourth and Fifth Amendments, *Terry v. Ohio,* 392 U.S. 1, 8–9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), *Katz v. United States,* 389 U.S. 347, 350, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), *Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), *see Olmstead v. United States,* 277 U.S. 438, 478, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting); in the penumbras of the Bill of Rights, *Griswold v. Connecticut,* 381 U.S., at 484–485, 85 S.Ct. 1678; in the Ninth Amendment, *id.,* at 486, 85 S.Ct. 1678 (Goldberg, J., concurring); or in the concept of liberty guaranteed by the first section of the Fourteenth Amendment, *see Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). These decisions make it clear that only personal rights that can be deemed "fundamental" or "implicit in the concept of ordered liberty," *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288 (1937), are included in this guarantee of personal privacy. They also make it clear that the right has some extension to activities relating to marriage, *Loving v. Virginia,* 388 U.S. 1, 12, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); procreation, *Skinner v. Oklahoma,* 316 U.S. 535, 541–542, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); contraception, *Eisenstadt v. Baird,* 405 U.S., at 453–454, 92 S.Ct. 1029; *id.,* at 460, 463–465, 92 S.Ct. 1029 (White, J., concurring in result); family relationships, *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944); and child rearing and education, *Pierce v. Society of Sisters,* 268 U.S. 510, 535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), *Meyer v. Nebraska, supra.*

█ As for the right of privacy under Maryland law, the Court of Appeals has noted: "It is, of course, no longer open to question that the right of privacy is protected by the federal constitution and that where the right is applicable, regulation limiting it must be justified by a 'compelling state interest.'" *Montgomery County v. Walsh,* 274 Md. 502, 512, 336 A.2d 97 (1975) (citation omitted). Assuming, *arguendo,* that the right to privacy is also protected by the Maryland Constitution, we hold that those protections are *in pari materia* with those provided by the U.S. Constitution.

"The cases sometimes characterized as protecting 'privacy' have in fact involved at least two different kinds of interests. One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." *Whalen v. Roe,* 429 U.S. 589, 598–600, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977) (footnotes omitted). It is the first interest that is at issue here.

█ Doe contends that the main result of the disclosure of information about him is the harm to his reputation. The Supreme Court has held, however, that damage to an individual's reputation, without more, does not implicate an interest protected by the Constitution. *See Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). In *Paul v. Davis,* the plaintiff complained that police were posting signs in local businesses that accused him of being an "Active Shoplifter." *Id.* at 697, 96 S.Ct. 1155. The Court held that this did not violate his substantive due process or privacy rights:

[W]e hold that the interest in reputation asserted in this case is neither "liberty" nor "property" guaranteed against state deprivation without due process of law.

\* \* \*

The activities detailed as being within th[e] definition [of the right to privacy] were ones very different from that for which respondent claims constitutional protection—matters relating to marriage, procreation, contraception, family rela-

tionships, and child rearing and education. In these areas it has been held that there are limitations on the State's power to substantively regulate conduct.

Respondent's claim is far afield from this line of decisions. He claims constitutional protection against the disclosure of the fact of his arrest on a shoplifting charge. His claim is based, not upon any challenge to the State's ability to restrict his freedom of action in a sphere contended to be "private," but instead on a claim that the State may not publicize a record of an official act such as an arrest. None of our substantive privacy decisions hold this or anything like this, and we decline to enlarge them in this manner.

*Id.* at 713, 96 S.Ct. 1155.

In the wake of *Davis*, a "stigma-plus test," has been "utilized to analyze civil due process challenges in many of the federal circuits." *Young, supra,* 370 Md. at 718 n. 13, 806 A.2d 233. This test requires that, in addition to hurting the plaintiff's reputation, the State's conduct harm the plaintiff in some other way. *See, e.g., Cooper v. Dupnik,* 924 F.2d 1520, 1532 n. 22 (9th Cir.1989) ("The 'plus' part of th[e stigma-plus] test can be met by either the denial of a right specifically secured by the Bill of Rights (such as the right to free speech or counsel), or the denial of a state-created property or liberty interest such that the Fourteenth Amendment's Due Process Clause is violated."), *rev. on other grounds by Cooper v. Dupnik,* 963 F.2d 1220 (9th Cir.1992) (en banc). The Court of Appeals has noted that registration "may implicate social ostracism, loss of employment opportunities, and possibly verbal and physical harassment, which could satisfy the 'stigma plus' test." *Id.* Even if we assume, *arguendo,* that it does, Doe's right to privacy was not violated.

There are two Supreme Court cases to address the right of privacy in the context of a government-created database. First, in *Whalen,* the Court upheld New York State's creation of a centralized database that recorded the names and addresses of all patients who were prescribed drugs for which there is an active black market. *Whalen, supra,* 429 U.S. at

603–04, 97 S.Ct. 869. Although the Court acknowledged that "the statute threatens to impair both [the patients'] interest in the nondisclosure of private information and also their interest in making important [medical] decisions independently," it felt that the invasions of privacy were minimal, similar to other invasions required by modern medicine, and that adequate safeguards were in place to protect the database. *Id.* at 600–03, 97 S.Ct. 869. In *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977), the court rejected Nixon's claim that forcing him to turn over presidential papers and recordings violated his constitutional right to privacy. *Id.* at 458–59, 97 S.Ct. 2777. The court found Nixon's claim even weaker than that in *Whalen* because of the public interest in seeing the presidential papers and because "purely private papers" would be returned to Nixon. *Id.*

These two cases were relied upon by the Ninth Circuit in deciding *Russell v. Gregoire*, 124 F.3d 1079 (9th Cir.1997), and upholding Washington State's sex offender registration statute against a right to privacy challenge. Although Washington, like Maryland, posts data about sex offenders on the internet, the Ninth Circuit held that this did not constitute "undue dissemination" because: "The information collected and disseminated by the Washington statute is already fully available to the public and is not constitutionally protected .... [or is information that is not] generally considered 'private.'" *Id.* at 1093–94 (quoting *Johnson v. Sawyer*, 47 F.3d 716, 732–33 (5th Cir.1995) (en banc) (discussing common law invasion of privacy)). The right to privacy, in the sense of forbidding disclosure of personal matters, has generally been held not to extend to information already in the public record. For example, in *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975), the Supreme Court noted that "even the prevailing law of [the tort of] invasion of privacy generally recognizes that the interests in privacy fade when the information involved already appears on the public record," before holding that it was a violation of the First Amendment to criminalize the publication of a rape victim's name, at least where the name is available in the public

record. *Id.* at 494–95, 95 S.Ct. 1029; *accord Fla. Star v. B.J. F.*, 491 U.S. 524, 540–41, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989). A person's criminal record is part of the public domain, and is largely created and held by the judicial system itself.

In *Doe v. Shady Grove Adventist Hosp.*, 89 Md.App. 351, 598 A.2d 507 (1991), this Court quoted favorably from *Doe v. Prudential Ins. Co.*, 744 F.Supp. 40 (D.R.I.1990), which had held that the court need not permit a family to proceed under a fictitious name where they were bringing a wrongful death suit on behalf of a family member with AIDS. Further, the *Prudential* Court held that "it is inappropriate for the Court to bar access to otherwise public records solely on the basis of subjective feelings of confidentiality or embarrassment of the type asserted here." *Prudential, supra,* 744 F.Supp. at 41 (quoted in *Shady Grove, supra,* 89 Md.App. at 363 n. 6, 598 A.2d 507). Similarly, we do not believe that sex offenders have the right to keep their convictions "under seal" or otherwise away from the public eye, simply because the offenders find them embarrassing.

Doe cites *United States DOJ v. Reporters Comm. for Freedom of Press,* 489 U.S. 749, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989), which held that FBI-compiled "rap sheets" should not be made available to the public via a Freedom of Information Act (FOIA) request, even though an individual's past criminal offenses are part of the public record. *Accord Dep't of the Air Force v. Rose,* 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976) (FOIA case upholding *in camera* inspection of the case summaries of honor and ethics hearings at military academy in order to protect cadets' privacy interests). *Reporters Committee* is inapposite, however, because it interprets a federal statute, not the Constitution. We find those cases unpersuasive.

In addition to the information in the public record, the sex offender registry contains a picture of Doe and his address. These are generally not considered private because a person's image can be readily observed by any passerby and addresses

are available in the phone book or on the internet, and they are not intimate details of the kind ordinarily considered "private" under the law. For all of the forgoing reasons, we hold that the sex offender registry does not violate Doe's constitutional right to privacy, nor does Maryland's sex offender registration statute violate Doe's procedural due process or equal protection rights. Therefore, we affirm the judgment of the circuit court.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY IS AFFIRMED. COSTS TO BE PAID BY APPELLANT.**